THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.*
FRED HENTZ, Defendant-Appellee.

First District (1st Division)   No. 78-1723

Opinion filed August 20, 1979.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Nicholas P. Iavarone, Assistant State's Attorneys, of counsel), for the People.

Terry A. Ekl, of Connolly, Dwyer & Ekl, of Chicago, for appellee.

Mr. JUSTICE McGLOON delivered the opinion of the court:

On January 2, 1977, the defendant was indicted for the murder of Malcolm Thompson. Prior to trial, the defendant filed a motion seeking to suppress statements that he made to the police at his home and later at the police station. After a hearing, the trial court ordered that all the statements be suppressed and the State now appeals.

On appeal the State contends that the trial court erred in ordering the statements suppressed. Although acknowledging that defendant did not receive his *Miranda* warnings prior to making the oral statements at his home, the State argues that these oral statements were given in response to questions asked defendant by patrol officers as part of a general, on-the-scene questioning and that *Miranda* warnings were thus not required. As to the statements given at the police station, the State argues that the defendant knowingly and voluntarily waived his *Miranda* rights prior to making these statements.

We affirm.

The first witness to testify at the hearing on the motion to suppress, Officer Joel Westbrook, testified that on January 2, 1977, at approximately 8 a.m., he and his partner, Officer Casper, received a radio message and proceeded to 614 East 92nd Street in Chicago where they found the victim of a gunshot wound. After speaking with the wounded man, who stated that the defendant had shot him, Officers Westbrook, Casper and Reynolds and Sergeant Wilson proceeded to defendant's residence. With his gun drawn, Officer Westbrook approached the front door with Officer Casper. The other policemen covered the back door. Officer Westbrook then knocked on the door and when the defendant answered, the officer asked him what had happened. The defendant replied that he had had

an argument with the victim and had shot him. Officer Westbrook made further inquiries concerning a weapon and as a result of the defendant's answers also recovered the weapon. Although Officer Westbrook admitted that the defendant was not advised of his rights prior to making the above statements, he indicated that the defendant was not in custody or under arrest when he made the incriminating statements. Officer Westbrook also stated, however, that if the defendant had started to run, he would have stopped him. Officer Westbrook went on to testify that after the defendant made the above statements he was transported to the police station where he was brought to an interrogation room and advised of his rights. Officer Westbrook explained the defendant his rights and the defendant indicated that he understood those rights. The defendant told Officer Westbrook that he would make a statement.

Also called by the State to testify at the hearing on the motion to suppress was investigator William Mosher. Investigator Mosher, who advised the defendant of his rights at the police station, testified that the defendant had difficulty understanding his rights and that he had to go into detail in explaining the defendant his rights. It took approximately three minutes for the witness to explain the defendant his rights, but the defendant finally understood his rights. On redirect examination, investigator Mosher explained that the defendant had trouble understanding the word "waive" and the fact that a lawyer would be appointed for him. Mosher explained that the word waive meant "give up" and that the defendant then understood. He further explained that a lawyer would be appointed for the defendant when he got to court. Investigator Mosher was present when an assistant State's Attorney, Joe Macellaio, advised the defendant of his rights. The defendant then gave a written statement and later made corrections on the statement. After the defendant gave the statement transcribed by the court reporter, he telephoned an attorney for the first time. He then refused to sign the statement.

Testifying in his own behalf, the defendant stated that he had never heard of "Miranda rights" and that he did not understand he had a right to have a lawyer present during questioning. He testified that when he talked to investigator Mosher and the assistant State's Attorney he did not understand that he was waiving his right to have an attorney present, that what he was saying could be used against him in court, and that he was incriminating himself. He testified that either investigator Mosher or the assistant State's Attorney told him that if he talked to them he would be helping himself. The defendant also stated that before the court reporter came into the room, the assistant State's Attorney told him to say "Yes, Sir" to the questions they would ask him and that he did as he was told.

During direct examination, defense counsel read to the defendant his

rights and asked defendant to explain the meaning of these rights. The defendant's answers reflected a certain amount of confusion and hesitation.

On cross-examination, the defendant testified that when he indicated in the statement transcribed by the court reporter that he understood his rights that he in reality did not understand what he was saying and that the rights did not make sense to him. He further testified that he talked to his sister who said she would obtain a lawyer for him. The defendant, however, never told this to the police. The defendant also testified that while giving his statement the assistant State's Attorney would cut him off. Although given the statement to read the defendant made no corrections in the statement.

The defendant was also questioned at the hearing concerning his educational background. He indicated that he went to high school in Mississippi where he completed 11 years of education. His high school closed and he joined the Navy. The defendant also attended Martin Luther King, Jr., College where he took accounting, English, business law, and mathematics. The only course he was sure he passed was typing. The defendant also stated that he was a currently unemployed automobile mechanic and had 17 brothers and sisters. The defendant also stated that his father and mother lived on a cotton farm near Lamar, Mississippi, where he attended grammar school in an eight-room school house.

Called to testify in rebuttal was the court reporter who transcribed the defendant's statement. She indicated that the defendant expressed no difficulty in understanding what was asked of him and answered all the questions asked of him. She further testified that the assistant State's Attorney never went off the record during the course of the statement or stopped the defendant from completing an answer to a question.

On cross-examination, the court reporter indicated that she could not recall if the defendant hesitated before answering the questions put to him. She also admitted that when she first saw the defendant, he was in the interview room with Mr. Macellaio. She could not hear what Mr. Macellaio was saying before she actually entered the room.

Also called to testify was assistant State's Attorney Joseph Macellaio who stated that he first spoke to the defendant in the lockup where he advised the defendant of his rights. Although Macellaio had to explain to the defendant the meaning of some words, the defendant indicated he understood the rights. It took Mr. Macellaio from two to five minutes to read and explain the defendant his rights. Mr. Macellaio indicated that the only time he had difficulty communicating with the defendant was in the lockup.

■■ We first consider the State's contention that *Miranda* warnings were not necessary prior to the statements given by the defendant at his

530

home. In *Miranda v. Arizona* (1968), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the United States Supreme Court set forth rules of police procedure applicable to situations involving "custodial interrogation." The court defined this type of interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612.) Whether a custodial setting exists must be determined by an objective evaluation of the circumstances surrounding the questioning. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) However, not all interrogation requires the *Miranda* warnings. As stated in *People v. Tripkovich* (1972), 6 Ill. App. 3d 37, 45-46, 284 N.E.2d 323, 329:

> "General questioning on the scene as to facts surrounding a crime or such questioning of citizens in the fact-finding process are unaffected by the holding in *Miranda*. A defendant's response to a single question, such as 'what happened?' is not the product of a custodial interrogation requiring the *Miranda* warnings."

In the instant case the State maintains that the statements elicited from the defendant at his home were given in response to general, on-the-scene questions and were not the result of a custodial interrogation. We disagree.

A review of the undisputed facts in the instant case reflects that the police officers questioned the defendant at his home—not at the scene of the crime. Having been told by the victim that his assailant was the defendant, the police officers proceeded to the defendant's house considering the defendant a suspect—not merely somebody who could provide information about the shooting. It is also clear that the police had no intention of letting the defendant escape. Two police officers covered the back entrance to defendant's house and another testified that if during the questioning the defendant had tried to run he would have been stopped. Moreover, and of the greatest significance, is the fact that at least one of the officers who greeted the defendant had his gun drawn. Contrary to the prosecution's argument, the instant situation is unlike that in *Tripkovich*, where the police officers arrived at the scene of a crime and as part of the fact-finding process asked "what happened?" or the situation in *Wipfler*, where the defendant voluntarily went to the police station to answer questions and was free to go at any time during the questioning. As stated in *State v. Intogna* (1966), 101 Ariz. 275, 281, 419 P.2d 59, 65:

> "Certainly a defendant questioned by an officer with a drawn gun within three feet of him was deprived of his freedom in a significant way. Clearly, the officer had no intention of letting the

defendant escape and defendant himself could not have reached any other conclusion."

Considering all of the above factors present in the instant case, we conclude that the defendant was deprived of his freedom in a significant way and that under *Miranda v. Arizona* should have been given his *Miranda* warnings prior to being questioned at his home. Since the police failed to issue such warnings, the trial court properly suppressed the statement defendant gave at his home.

We next turn our attention to the State's contention that the trial court erred in suppressing the statements made by defendant while he was in custody. The State argues that these incriminating statements were made only after the defendant was advised of his rights and knowingly and voluntarily waived those rights. In attempting to show that the defendant voluntarily and knowingly waived his constitutional rights, the State bears a heavy burden (*People v. Vanderwerff* (1978), 57 Ill. App. 3d 44, 372 N.E.2d 1014), and must establish in this appeal that the trial court's finding is against the manifest weight of the evidence. (*People v. Noblin* (1973), 15 Ill. App. 3d 1060, 305 N.E.2d 658.) In the instant case, the trial court specifically noted that the defendant was a person of very low verbal skills who did not understand easily. Although these qualities alone do not *ipso facto* render an accused incapable of understanding or waiving his constitutional rights (*People v. Reed* (1972), 8 Ill. App. 3d 977, 290 N.E.2d 612), they certainly are factors to be considered in determining the voluntariness of defendant's waiver. It is our conclusion after reviewing the record, that the trial court's ruling that defendant did not voluntarily waive his rights is not against the manifest weight of the evidence. Investigator Mosher admitted that when he read the defendant his rights, the defendant had some difficulty in understanding them. The assistant State's Attorney also indicated that the defendant had some difficulty in understanding some words involved in explaining the defendant his rights. Additionally, the defendant himself was asked questions concerning his understanding of his rights and his explanation indicated a lack of understanding. The defendant further testified that he had never heard of *Miranda* warnings previously. Apparently, the trial court believed the defendant. As stated in *People v. Carpenter* (1976), 38 Ill. App. 3d 435, 439-40, 347 N.E.2d 781, 786, a case relied upon by the State:

"The trial judge, having observed the witnesses, their demeanor while testifying, their candor and sincerity, was in a far better position than the reviewing court to weigh the evidence regarding defendant's ability to understand and waive his *Miranda* rights."

We believe it particularly appropriate, where the defendant's ability to understand his rights is at issue, to defer to the judgment of the trial court who had the opportunity to observe the defendant and hear his testimony. Considering all of the evidence presented at the hearing, we do not find that judgment to be against the manifest weight of the evidence.

■■ The State raises the additional argument that the trial court's conclusion that the defendant had low verbal skills and difficulty in understanding was the result of improperly taking judicial notice of the nature of the schools attended by the defendant. We first point out that the only indication in the record that the trial court took judicial notice of anything is a statement by the court concerning the admissions policy of the college that defendant attended. While we agree with the State that such would not be a proper subject of judicial notice, we disagree with the State's contention that the trial court's judgment was improperly influenced thereby. At most, the trial court's reference to the above admissions policy was a statement that the mere fact defendant was admitted to college did not *ipso facto* mean that he possessed average verbal skills or the ability to understand easily. We would also note that the State, in its closing argument, tried to argue as much.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

O'CONNOR and CAMPBELL, JJ., concur.