THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
GREGORY JOHNSON, Defendant-Appellant.

First District (4th Division)    No. 79-1064

Opinion filed May 21, 1981.

James J. Doherty, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Pamela L. Gray, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE ROMITI delivered the opinion of the court:

Defendant Gregory Johnson, having been convicted in a jury trial of murder and attempt armed robbery, was sentenced to concurrent prison terms of 16 to 22 years and 4 to 8 years for those respective crimes. On appeal he contends: (1) a statement allegedly taken from him at his home was the product of custodial interrogation and should have been suppressed because he had not first been advised of his rights; (2) statements allegedly made by him while in custody after charges had been filed against him should have been suppressed because they were made without benefit of counsel; (3) defendant's guilt was not established beyond a reasonable doubt; (4) the trial judge abused his discretion in preventing defense counsel from using an exhibit at trial.

We affirm.

Prior to trial defendant made several motions to suppress a number of statements he had allegedly made. At the hearing on those motions the following pertinent evidence was adduced. Officer Lonnie Segroves testified that on August 9, 1975, at about 2 a.m. he and his partner, Philip Lane, were on patrol in a marked squad car in Chicago on 21st Street, just west of Leavitt Street. Two men ran west on 21st in front of the squad car, pursued by a group of people. Segroves identified defendant in court as one of the two men being pursued. Segroves and his partner drove west in pursuit, and Segroves then got out of the car and stopped one of the men. The defendant ran past, in front of the squad car to the corner of 21st and Oakley, where he stood for several seconds and then ran down a gangway. Segroves spoke to one of the pursuers, Mr. Chavira, in English and some broken Spanish. Chavira said "something like" he had just been hit by a bat. But he then got upset and nervous and told the officer to "forget it." Segroves released the man he was holding and the group of pursuers left. The officers drove east on 21st Street to Leavitt where they saw an ambulance and a squad car. A man was being placed on a stretcher and Segroves learned that he had been beaten or had been involved in a fight. Two police officers at the scene told Segroves that the two people who had perpetrated the attack had been chased by the group. Chavira also appeared at the scene and stated that Segroves had "let the ones go that had done this to the man." Segroves then went back to where he had caught the one man. One of a group of teenagers there told him that one of the two men was known as Greg and lived at 2329 West 21st Place.

The officers went to that address, arriving at about 2:50 a.m. At this

time, according to Segroves, he believed defendant was involved in something but did not know what it was or if it was a crime. He also did not know who the actual eyewitnesses to the incident were. The defendant came to the door and the officers spoke with him on the front porch, telling him they were investigating an incident at 21st Street and Leavitt, and asking him why he was there. Defendant told them that he and his friend, Ricardo Amora, had been chased by a group of "Mexicans" for unknown reasons. At some point during this conversation defendant's mother also came to the porch. Segroves asked defendant if he would come to the hospital. Segroves denied having told defendant to come along and also denied that he had placed defendant under arrest at this time. Defendant's mother asked if she could accompany the defendant and the officers assented. The four then drove to Amora's home and he accompanied them to the hospital. Segroves testified that Amora was the same person he had stopped on the street. At the hospital defendant and Amora remained in the squad car for about 15 to 30 minutes. According to Segroves they were not yet under arrest and could have left had they wished to do so. Chavira and some other people came to the car and identified Amora in connection with the battery. Segroves then informed the two men that they were under arrest and they were taken to police headquarters.

Defendant testified at the hearing that the police came to his home without a warrant and immediately ordered him into their car, informing him that he was under arrest. He had been sleeping and had not committed any crime in their presence. He denied making any statement to them at that time. He did not mention Amora's name but the police, who had not told him why he was under arrest, told him they were going to Amora's house. From there he and Amora were transported to the hospital where some people identified Amora. Defendant stated that he was not handcuffed during this time.

Investigator William Baldree testified that on August 13, 1975, he went to Branch Court 43 and informed Assistant State's Attorney Parkerson that the victim had died. Parkerson requested the transfer of the case to Branch 66. Defendant was present and was advised by the judge to speak to a lawyer before he spoke to anyone else. The judge also told him that if he could not afford private counsel he should request the public defender. According to the transcript of the proceedings at this hearing, which was stipulated to at the hearing, the State also requested leave to file an additional charge of murder against the defendant and leave to do so was granted. The murder charge was filed on that date, but the record is silent as to the exact time at which it was filed.

According to Baldree defendant was interviewed in the lock-up next to the courtroom by Baldree and Parkerson. Parkerson first advised

defendant of his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. After each right was told to him defendant nodded and stated yes. (At trial Parkerson also testified that defendant then gave permission for a statement to be taken.) Defendant did not ask to speak to an attorney. He did give a statement.

On August 16 Baldree again spoke with the defendant. He did not advise the defendant of his rights. The defendant at that time made another statement.

Defendant's testimony as to the lock-up statements was also elicited at the hearing. On the morning of his arrest he cut his wrist and was taken to the hospital. On August 13 he was taken to court, where he appeared before a judge. The judge advised him to remain silent, to get a public defender, and to talk to a lawyer before talking to anyone else. He was then taken to the lock-up where several men questioned him without advising him of his rights. He repeatedly asked to see his lawyer, Mr. Stearney (trial counsel), who had represented him before, but he was told he could talk to him later. Defendant denied giving the men a statement.

At the conclusion of the hearing the trial court suppressed the statement of August 16 but denied defendant's request that the statements of August 9 and August 13 be suppressed.

At trial Officer Segroves again testified to having observed two men run in front of the squad car at about 2 a.m., with a group of people running behind them. He described one of them as "Mexican," with dark pants and a white undershirt. The other, identified by Segroves in court as the defendant, wore dark pants and what Segroves described variously as a light-colored shirt, a short-sleeved colored shirt, and a t-shirt. Segroves caught the "Mexican" after the man had discarded a baseball bat, but the defendant ran in front of the police car and kept going. As Segroves held the one man, the group running behind approached. Segroves spoke to Chavira, whom he understood to say that he had been struck with a bat. Chavira then told the officers to "forget it," and the man was released. The officers resumed their patrol but then saw a fire department ambulance which they followed to 2014 South Leavitt. There they learned that an offense had been committed and saw the victim being placed into an ambulance. They returned to where they had stopped the runner and learned from one of several teenagers there that the man who had gotten away was named Greg and lived at 2329 West 21st Place. At that location a woman answered the door and told them upon inquiry that she had a son named Greg. When they asked to speak to him she brought to the door a man Segroves identified as the defendant and as the man whom they had seen being chased earlier that evening. Defendant was asked what had happened at that time. He responded that he and a friend were chased by a group of "Mexicans," for no apparent reason. He identified

this friend as Ricardo Amora and gave his address. Defendant agreed to come with the officers and they proceeded to Amora's house and then went on with Amora to the hospital. Segroves testified that Amora was the same person he had detained on the street. At the hospital some of the people that had been chasing the two identified Amora. He and the defendant were then arrested. The officers drove back to where Amora had discarded a bat and recovered two bats.

Segroves' partner also testified at trial, substantially corroborating his account of the evening.

Assistant State's Attorney Frank Parkerson testified about the statements obtained from the defendant on August 13, 1975. Defendant related, in essentially narrative form, several exculpatory accounts of what happened on August 9, 1975. He first stated that he was standing on the corner of 21st and Oakley when two men came down the street and each threw a baseball bat at him. He picked up one bat and threw it back. He then heard several shots fired, but denied participating in or observing any fight. Defendant then changed his account, stating that it was one man, who looked exactly like defendant, who threw the bat at him. Defendant also stated that he was with Amora at the time. Defendant had had only one beer but Amora was "kind of messed up on alcohol." When Parkerson informed defendant that police officers had seen him fleeing the scene he gave a third account, stating that he and Amora had a conversation concerning "jack-rolling." Amora and the man who resembled defendant chased two other people. The man resembling defendant hit a man with a bat and demanded his money. Defendant fled. In a fourth account defendant gave the location as 21st and Leavitt and did not indicate that Amora was doing anything. Finally in a fifth account defendant essentially repeated his third account except to change the location to several doors west on 21st Street rather than on the corner and to state that he did not run until the man resembling him threw a bat at him and he threw it back.

The pathologist who performed the autopsy on the victim testified that the death resulted from cranial cerebral injury inflicted with a blunt object applied with a strong force.

The State also presented the testimony of Hector Escarzaga. At about 2 a.m. he left a tavern at Cullerton and Leavitt in the company of the victim, Arturo Torres. At the tavern Escarzaga had sold his car for $200 cash. As they were walking down Leavitt toward 21st Street, Escarzaga heard someone shout something about how much money he and Torres had. He turned to see two men, carrying baseball bats, running toward them. One man was smaller, with dark hair; the other was taller, with light hair. Both were wearing white t-shirts and dark pants. As Escarzaga fled he looked back and saw the men reach Torres and try to hit him; he then

heard the sound of the impact. He reached the El Gallo lounge, located on 21st Street, just off of Leavitt. There he summoned help and ran back to where he had left Torres, followed by Manuel Chavira and others from the bar. Escarzaga saw two men, who looked like the two he had just seen, bending over and touching Torres. Both men had baseball bats and were wearing white t-shirts and dark pants. One was shorter, with dark hair; the other was taller, with blond hair. About one minute had elapsed since he had left Torres to get help. The two men ran to Leavitt and went west on 21st Street, pursued by a group of people from the El Gallo, including Chavira.

Manuel Chavira testified that he was the bartender at the El Gallo that evening. At about 2 a.m. Escarzaga ran in, shouting that someone had hit Torres. Chavira ran to the corner of Leavitt and 21st Street, from where he could see Torres lying on the ground. Two men with baseball bats had their hands on Torres, in his clothes. They were wearing white t-shirts and dark pants. One was taller, with blond hair; the other was shorter, with black hair. Chavira ran toward them, was interrupted by a car which passed in front of him and nearly hit him, then kept on running after them. The men ran about one block down 21st Street, pursued by Chavira. Both men discarded their bats during the chase. As Chavira and the others from the bar continued the chase they passed a police car in the alley. The car drove ahead and stopped in front of the two men. Chavira or one of the officers (he testified both ways) caught the shorter dark-haired man, but the other man ran around the police car and kept on going. Chavira attempted to speak to the police about the man they had caught, but they could not understand him and they let the man go.

Defendant also called Officer Segroves as a witness, eliciting from him the fact that the bats were not recovered until several hours after Segroves had seen Amora discard one. In the interim he did not attempt to have the area guarded. The bats were inventoried and sent to the crime lab.

Also called by defendant was Officer Thomas McCarthy, who had interviewed Chavira about the events in question. Chavira told him that the two men he chased down the street had unsuccessfully attempted to get into a car which then sped away, almost striking Chavira.

Defendant's mother testified that on the night in question she arrived home about 11:30 p.m. Some time later defendant arrived, wearing dark pants and long-sleeved yellow shirt with the sleeves rolled up to below the elbows. He was not then out of breath. About half an hour later the door-bell rang and she answered it to find that the police were there, asking to speak to her son. She went upstairs to get him, finding him still awake and still wearing the same clothes. He spoke to the officers outside

and then came back in to tell her he had to leave with them. She received permission to come along.

Defendant testified that he had played basketball with friends that evening until about 9:30. They all remained in the park until the late hours of the night. On his way home, as he was walking down Leavitt toward 21st Street, defendant saw a fight on the other side of the street. Two men in white t-shirts and dark pants were beating another man. One of the two attackers was taller, with blond hair; the other was shorter, with dark hair. Defendant was about 25 to 30 feet away when one of the men told him to leave, swore, and threw a bat at him. Defendant did not pick up the bat, but instead ran toward the corner of 21st and Leavitt. He heard screaming and saw a group of "Mexicans" running toward him. He ran down 21st Street toward his home, some three blocks away. While running he noticed Ricky Amora several houses behind him. He had seen Amora around the neighborhood but did not know him personally. Defendant ran past a police car and on to his home. He was wearing a yellow shirt and dark pants that evening. When the police came he was still wearing those clothes. Defendant admitted talking to Assistant State's Attorney Parkerson in the lock-up several days later, but denied making the statements attributed to him by Parkerson. At that time his yellow shirt was taken from him by Officer Baldree. Both defendant and his mother identified a defense exhibit as the shirt in question.

In rebuttal the State called Officer Segroves, who testified that when he went to defendant's home defendant was wearing dark pants but no shirt. When they left for the hospital defendant put on a long-sleeved yellow shirt. Segroves identified the same shirt identified by defendant and his mother as the shirt defendant had put on. He also stated that this was not the shirt defendant had worn while running from the group earlier that evening.

### I

We first consider defendant's contention that the statement he allegedly made to the police on his porch should have been suppressed as the product of custodial interrogation conducted without first advising him of his *Miranda* rights.

The *Miranda* warnings must be given to one who is questioned while in custody or while he is otherwise deprived of his freedom in any significant way. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) It is clear that defendant was questioned by the police at his home. It is equally clear that the police testimony, which the trial court accepted, established that defendant was not at that time formally under arrest.

Thus, the remaining question is whether he was deprived of his freedom in any significant way. Defendant places considerable emphasis on the fact that he was a suspect when the police arrived at his home. But as was stated in *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714:

> "* * * a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited."

In this cause we find that the evidence does not establish such a restriction on defendant's freedom. The questioning of the defendant took place entirely on his front porch and there was no evidence the police ever entered his home. As we have noted, the police testified that defendant was not told he was under arrest, nor did they consider him to be under arrest. Even after defendant made the statement to the police, the facts do not establish a custodial situation. He was asked if he would accompany them, rather than being ordered to do so. According to defendant's mother's testimony he was permitted to reenter his home to tell his mother where he was going. His mother requested and was granted permission to also come. Defendant was not handcuffed while in the police car and the police testified that he would have been free to leave up until the time Amora was identified.

■■ The cases cited by defendant are inapposite. In *Orozco v. Texas* (1969), 394 U.S. 324, 22 L. Ed. 2d 311, 89 S. Ct. 1095, custodial interrogation was held to have occurred where defendant was questioned by police in his bedroom and the police testified that he had already been placed under arrest. In *People v. Hoffman* (1980), 81 Ill. App. 3d 304, 401 N.E.2d 323, the police chased an assault suspect to his trailer, searched him for weapons, and brought him out in handcuffs. One officer testified to his belief that defendant was under arrest in the trailer. Thus the

questioning of the defendant, which took place in the trailer, was held to be custodial. In *People v. Hentz* (1979), 75 Ill. App. 3d 526, 394 N.E.2d 586, the victim of a shooting named the defendant as his assailant. The police entered defendant's home with at least one gun drawn, while other officers guarded the home's back entrance. Again the ensuing questioning was held to be custodial based on these circumstances. In this cause the questioning of the defendant took place at his home, but there the resemblance to the cases cited by defendant ceases. No guns were drawn, no entrances were guarded, and the officers did not consider defendant to be under arrest. The questioning took place entirely on his porch, and he was apparently free to move in and out of his home. Even after the statement was elicited he was not handcuffed and according to police testimony was free to leave. Given these factors we find no basis for overturning the trial court's determination that defendant was not at that time subjected to custodial interrogation, so that no *Miranda* warnings were required.

## II

Defendant has also challenged the admissibility of the statements taken from him in the lock-up. He concedes that there was evidence that he was advised of his right to counsel before being questioned, but contends that these warnings were insufficient.

■■ Under the holdings of *Massiah v. United States* (1964), 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199, and *Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232, it is clear that a defendant is entitled to the assistance of counsel once adversary proceedings have commenced against him. It is also clear that in Illinois the filing of a complaint against a defendant constitutes one manner of commencing such proceedings. (Ill. Rev. Stat. 1975, ch. 38, par. 111—1; *Moore v. Illinois* (1977), 434 U.S. 220, 54 L. Ed. 2d 424, 98 S. Ct. 458.) In this cause at the court appearance which preceded the lock-up questioning of the defendant the State sought leave to file the additional charge of murder against the defendant because the victim had died. Permission to file that charge was granted, and it was filed the same day, although the record does not disclose whether that filing preceded the questioning at issue. In any event the fact that this was an additional charge establishes to our satisfaction that some charges had already been filed. Indeed the record contains an undated complaint for attempt armed robbery. Thus, at the time of the lock-up questioning defendant had a right to the assistance of counsel under *Massiah* and its progeny.

By statute in Illinois at the time charges against a defendant are filed in court the judge must advise the defendant of his right to counsel and must appoint counsel if the defendant is indigent. (Ill. Rev. Stat. 1975, ch.

38, par. 109—1.) In this cause the judge who granted leave to file the additional charge of murder advised the defendant he should talk to a lawyer before talking to anyone else and also advised him to request the public defender if he did not have a lawyer. Immediately thereafter defendant was advised by Assistant State's Attorney Parkerson that he had a right to counsel; that counsel would be appointed for him if he was indigent, and that he had a right to the presence of counsel during questioning. However, defendant contends that because the judge had not immediately appointed counsel for him he cannot be held to have waived his rights under *Massiah.* Defendant did not request appointed counsel, nor does the record indicate that he was indigent and thus entitled to this. But even assuming the court erred in failing to make such an appointment, or to inquire as to the necessity of appointed counsel, we do not find that this affected the subsequent waiver by the defendant of his right to the presence of counsel at his interrogation.

Defendant indicated that he understood the *Miranda* rights explained to him and affirmatively gave his permission for a statement to be taken according to the testimony of State witnesses. The trial judge was entitled to believe this testimony rather than that of the defendant. We find no merit to defendant's contention that the explanation of his right to counsel should have been explicitly linked to *Massiah.* In this instance the sixth amendment right to counsel as articulated by *Massiah* and the fifth amendment right to counsel as enunciated in *Miranda* were indistinguishable in practical effect: they both entitled defendant to have counsel present during his interrogation. But the fact that his right rested on dual constitutional foundations did not require any warnings that were not given. Defendant was advised of the right and chose to waive it. Thus his statements subsequently elicited in the questioning were properly admitted into evidence.

## III

Defendant also contends that his guilt was not established beyond a reasonable doubt. No State witnesses were able to identify defendant directly as the assailant. But the testimony of three State witnesses, Chavira, Escarzaga, and Segroves, provides an unbroken chain of circumstantial evidence which we find to be sufficient to establish defendant's guilt beyond any reasonable doubt.

Escarzaga and the victim were chased by two men with white t-shirts and dark pants who carried baseball bats. One man was shorter, with dark hair; the other was taller, with blond hair. The men began to attack the victim as Escarzaga fled. He obtained the help of Chavira and others and returned to the scene in about one minute. He saw two men who looked like the ones who had chased him bending over the victim and

touching him. Chavira, who had followed Escarzaga back to the scene, also saw two men with their hands in the victim's clothes. He provided essentially the same description of them as had Escarzaga. He chased them, was interrupted by the passing of a car, then continued the chase until one man was caught and the other ran by the police. Officer Segroves caught one of two men chased by Chavira and the others. The other man, whom he identified in court as the defendant, escaped. Defendant himself later admitted to the police that he and his friend, Richard Amora, had been chased by a group of men. This evidence, which the jury chose to believe, was sufficient to establish defendant's guilt beyond a reasonable doubt.

Defendant has suggested that if at trial he presented an alternative theory of innocence which was also compatible with the evidence, then the jury was required to acquit him. We do not find this to be the law, nor do we find that defendant presented such a consistent theory.

The law in this State is that where a conviction rests solely on circumstantial evidence the guilt of the defendant must be so thoroughly established as to exclude every other *reasonable* hypothesis consistent with innocence. (*People v. Lewellen* (1969), 43 Ill. 2d 74, 250 N.E.2d 651; *People v. Williams* (1980), 85 Ill. App. 3d 850, 407 N.E.2d 608.) But in this cause the only other hypothesis advanced is that of defendant's exculpatory account of what occurred, as testified to at trial. The jury was not required to believe his testimony, and their failure to do so eliminates that hypothesis. Indeed his testimony was impeached in significant detail by his own prior admissions. Although at trial defendant admitted to only a casual knowledge of Ricky Amora and claimed to have seen him only after he fled from the scene of the attack, defendant had previously admitted to the police that he and Amora, whom he identified as a friend, had both fled from a group of men. And in one of his statements to the police defendant implicated Amora in the crime, stating that it was Amora and another man resembling defendant who had chased two other people after defendant and Amora discussed "jack-rolling." Furthermore, defendant's account of what transpired was not compatible with the testimony of the State's witnesses which, taken as a whole, established that defendant was one of two men who were seen holding bats and bending over the victim, going through his clothes. Thus defendant failed to present a plausible, reasonable hypothesis of innocence to counter the State's circumstantial case. The jury chose to believe the State's witnesses, and we find no basis for overturning that determination of credibility.

IV
Finally defendant claims that he was prejudiced when the trial court denied defense counsel's request to use a t-shirt as an exhibit. This was to

be used as demonstrative evidence in cross-examination of Officer Segroves concerning the shirt he saw defendant wearing at the time of the chase. Segroves had variously described this shirt in his testimony as a light-colored shirt, a short-sleeved colored shirt, and a t-shirt. However he had also testified that the long-sleeved yellow shirt which defendant claimed to have worn at that time, and which was shown to him at trial, was not the one he had seen the defendant wear while being chased. Defense counsel sought to utilize a t-shirt which he had brought into court as an exhibit to be used in examining Segroves concerning the difference between a t-shirt and other shirts. The trial court denied this request but noted that counsel was free to question the witness concerning his conception of the differences.

The propriety of receiving demonstrative evidence is a matter within the discretion of the trial court (*People v. Young* (1947), 398 Ill. 117, 75 N.E.2d 349; *People v. Fair* (1977), 45 Ill. App. 3d 301, 359 N.E.2d 848), and the court's exercise of that discretion will not be disturbed absent a showing of abuse of that discretion resulting in prejudice to the defendant. (*People v. Navis* (1974), 24 Ill. App. 3d 842, 321 N.E.2d 500.) Given the fact that defense counsel had the use of the shirt defendant claimed to have worn at trial and was able to freely question the witness concerning his definition of various types of shirts, we find no abuse of discretion and no resulting prejudice in the trial court's refusal to permit use of a t-shirt as an exhibit.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

JIGANTI and LINN, JJ., concur.