AMERICAN SAMOA GOVERNMENT, Plaintiff,

v.

PEPE LAM YUEN, Defendant.

AMERICAN SAMOA GOVERNMENT, Plaintiff,

v.

KOLOPA LAM YUEN, Defendant.

High Court of American Samoa
Trial Division

CR No. 57-05
CR No. 56-05

November 28, 2005

Before KRUSE, Chief Justice; SAGAPOLUTELE, Associate Judge; and SAOLE, Associate Judge.

Counsel: For Plaintiff, Frederick J. O'Brien, Assistant Attorney General
 For Defendant Pepe Lam Yuen, William H. Reardon
 For Defendant Kolopa Lam Yuen, Sharron I. Rancourt

## ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO SUPPRESS

### Factual Background

On June 2, 2005, acting on information from a confidential informant, Lieutenant Paulo Leuma ("Lt. Leuma") prepared an affidavit and application for a warrant to search the residence of Pepe Lam Yuen ("Pepe").[1] The affidavit notes that the confidential informant (the "CI") witnessed Pepe and his wife, Kolopa Lam Yuen ("Kolopa")[2] (collectively "Defendants") selling marijuana from their home and trading marijuana for valuable items between January 2005 and May 2005. The affidavit states that as recent as the last week of May 2005, the CI observed Pepe trading marijuana for concrete blocks to be used in building part of his house still under construction. Moreover, the affidavit notes that Pepe has two prior convictions for possession of marijuana, one in 1985 (CR No. 34-85) and the other in 1989 (CR No. 34-89).[3]

District Court Judge John L. Ward reviewed the application and a search warrant was issued. The search warrant listed marijuana, methamphetamine, and related paraphernalia as items to be seized, and permitted a search of "the house of Pepe Lam Yuen in the Village of Pava`ia`i/Aoloau, American Samoa, its curtilage and adjacent banana plantation." It described the house as a "single-story structure, part of which is still under construction," to be found on the Toluao family land "on the mountain from where cinders are hauled."

The ensuing search took place the following afternoon on June 3, 2005, and approximately twelve police officers were present. One group of officers, lead by Lt. Leuma, approached the Lam Yuen property from the Tafeta side of the mountain, and headed directly to Pepe's residence.[4]

---

[1] Throughout this order, we also refer to Pepe's house as "the Lam Yuen residence." We use these terms interchangeably.

[2] The affidavit specifically refers to a Papauta Lam Yuen. At the hearing, Lieutenant Paulo testified that he knew Papauta to be a nickname of Kolopa Lam Yuen. Thus, both names refer to the same person.

[3] Additionally, Pepe has also been convicted of Assault 3rd (a shooting incident involving a firearm) in CR No. 18-81; resisting arrest and eluding police officers in CR No. 51-87; and of contempt by the Land and Titles Division in *Lualemaga v. Asifoa*, LT No. 29-86 (Consolidated).

[4] White Lam Yuen, Defendants' daughter, testified that another group of officers entered both of her houses without her permission and without producing any documentation. Her home is a short distance from the Lam Yuen residence and consists of two structures--a living house and a dining

Upon seeing Pepe and Kolopa outside the house, Lt. Leuma announced the officers' presence and their possession of a search warrant.[5] As the officers approached the house, Pepe disappeared into his home.

Immediately thereafter, officers entered the Lam Yuen residence through an open front door, finding Pepe locked inside his bedroom. The police knocked on the bedroom door and announced their presence and intent to search the house multiple times. After receiving no response, the police kicked the door open, finding Pepe on his bed. A struggle ensued, forcing the officers to restrain Pepe with handcuffs. During this time, Officer Va`a Sunia ("Officer Sunia") asked Pepe if any controlled substances were in the house. Pepe responded "I got things." After removing Pepe from the house, the police conducted a search of the Lam Yuen residence.

Ultimately, the search produced a significant amount of marijuana, a .22 caliber pistol, several types of ammunition, money, drug paraphernalia, and fire works ("cherry bombs"). The police also discovered a women's wallet, identified by Kolopa to be her's, which contained a small plastic bag of marijuana.[6] All of these items were seized from the bedroom of the Lam Yuen residence. The police also noticed pallets of cement blocks across from the Lam Yuen home, and a concrete base for a second house in the immediate vicinity. Subsequent to the search, the police arrested both Pepe and Kolopa.[7]

After their arrest, on June 6, 2005, American Samoa Government ("ASG") charged Defendants with unlawful possession of controlled substances (marijuana), possession of an unlicensed firearm, and unlawful possession of ammunition. On June 24, 2005, Judge Elvis R.P. Patea held a preliminary hearing and found probable cause to believe that

house. Lieutenant Paulo testified that another group of officers did indeed come from the opposite side of the mountain, but he believed they were given consent to enter the houses. He also stated that he did not believe that either of the houses were searched.

[5] Additionally, upon arriving at the Lam Yuen residence, police officers observed a man in an ASPA truck who was attempting to drive away from the area. After finding marijuana in his possession, the police arrested him. However, ASG chose, at this time, not to file charges against him.

[6] The wallet also contained various forms of identification belonging to Kolopa.

[7] Before arresting Pepe, Officer Sunia informed Pepe of the items (marijuana, firearms, money, ammunition) found in the bedroom, to which he responded "that's my stuff" in Samoan. It was at that time that Officer Sunia advised Pepe of his rights and arrested him.

Defendants committed the above crimes.

Defendants now seek to suppress all physical evidence seized from Pepe's residence, as well as any statements Defendants made that ASG intends to use against them. Defendants claim that the search and seizure violated Article I Section 5 of the Revised Constitution of American Samoa, and the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution. Having conducted a hearing on the matter, we deny Defendants' motion to suppress physical evidence, grant in part and deny in part Pepe's motion to suppress his statements, and decline to address Kolopa's motion to suppress her statements.

## Discussion

Regarding the June 3 search and seizure, Defendants argue the following: (1) the warrant failed to comply with the particularity requirement of the Fourth Amendment and the *Leon* good-faith exception to the warrant requirement is inapplicable to this case; thus, the police lacked probable cause to search the structure that Pepe was found in; (2) the police failed to adhere to the "knock and announce" rule; (3) the police lacked probable cause to search Kolopa's wallet; and (4) Kolopa's arrest was unconstitutional. Additionally, Defendants contend that (5) all statements obtained from Defendants were taken in violation of *Miranda v. Arizona* and therefore must be suppressed. We address each of these claims in turn.

## I. Particularity of the Warrant

Defendants argue that the warrant failed to comply with the Fourth Amendment's particularity requirement because the warrant's description of Pepe's house as a "single-story structure, part of which is still under construction" inaccurately depicts the home searched, as no part of Pepe's home was under construction. They contend that the executing officer was not able to easily locate and identify the specified premises because the house described in the warrant did not exist. Thus, according to Defendants, there was a high probability that the police would search any structure where Pepe could be found, regardless of whether such structure was described in the warrant. Indeed, Defendants assert that the police searched several residences before finding Pepe's home, clearly indicating confusion over what house was to be searched. Defendants further argue that the officers are not entitled to the good-faith exception under *United States v. Leon*, 468 U.S. 897 (1984), because the warrant is so facially deficient as to make the officers' reliance upon it not objectively reasonable.

Resolving this claim turns on the following questions: (i) whether the warrant itself described the place to be searched with sufficient particularity; and (ii) if the warrant lacked particularity, does the good faith exception of *Leon* apply to this case.

A. Legal Standard

■ In order to be valid, a search warrant must describe with particularity the place to be searched. REV. CONST. AM. SAMOA, art. I, § 5; U.S. CONST. AMEND. IV. A warrant's description satisfies the particularity requirement when "the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503 (1925); *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (re-stating the standard as "whether the [description]. . .enable[s] the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched."). The purpose of this rule is to prevent blanket, open-ended searches. *Garrison*, 480 U.S. at 84.

In *Garrison*, a search warrant was issued for "the premises known as 2036 Park Avenue third floor apartment." *Id.* at 80. However, when the officers arrived, they found two separate dwellings on the third floor of 2036 Park Avenue. *Id.* Although the officer's search warrant was for a McWebb's apartment, it was not until after the officers finished searching Garrison's apartment and found contraband that they realized they had been searching the wrong apartment without warrant or authorization. *Id.* Nevertheless, the Court reasoned that a search warrant's validity "depends upon whether the officers" failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id.* at 88. The Court found that the officers' actions were understandable and reasonable "because the facts available to the officers at the time the warrant was issued suggested no distinction between McWeb's apartment and the third floor residence." *Id.* See also *United States v. Maneti*, 781 F.Supp. 169, 179 (W.D.N.Y. 1991) (search warrant inaccurately identifying place of search will, nevertheless, be upheld against particularity challenge if warrant describes structure as it was known or should have been known to officer after reasonable inquiry under the circumstances).

In light of *Garrison* and *Steele*, as well as other federal court decisions regarding the requisite description for a valid search warrant, the standard seems rather low. That is, the description will be adequate as long as an officer is able to identify and find the location with a reasonable effort. *See e.g., United States v. Hassell*, 427 F.2d 348, 349 (6th Cir. 1970); *United States v. Judd*, 889 F.2d 1410, 1413 (5th Cir.

1989); *United States v. Gahagan*, 865 F.2d 1490, 1496 (6th Cir. 1989). Such a determination naturally includes looking at the circumstances surrounding the search, such as an officer's knowledge of the defendant and the place to be searched, whether a defendant(s) was in control of all the premises searched, and whether the place intended to be searched was actually searched. *See United States v. Burke*, 784 F.2d 1090, 1093 (11th Cir. 1986) (search upheld where affiant was on the scene and pointed out house to be searched when an error was discovered in the address); *United States v. Alexander*, 761 F.2d 1294, 1300-01 (9th Cir. 1985) (warrant valid when it authorized search of street address with several buildings where defendants are in control of the whole premises); *United States v. Gitcho*, 601 F.2d 369, 372 (8th Cir. 1979) (search valid in part because premises searched were those intended to be searched); *see also Gahagan*, 865 F.2d at 1498-99 (number of other residents in the area affects possibility of a mistaken search of another premises).

## B. Analysis

■ Against the backdrop of the cited case law, we find that the warrant's description of Pepe's home is sufficient to validate the warrant. While we agree with Defendants that the warrant's description of the place to be searched is not completely accurate, this error is not fatal.[8] Indeed, the additional circumstances surrounding the search, including the nature of the property, the relevant information known by the executing officers in this case, and the risk of mistakenly searching other premises, clearly support a finding that the description was valid.

■ First, we note that the American Samoa landscape and the remote location of many homes, combined with the lack of street names and addresses, makes property description less precise than the sort of particularity achievable on the U.S. mainland. Such is the case here. The Lam Yuens lived up in the mountains in the hinterlands of Pava`ia`i adjacent to Aoloau, in an area hidden from the main road. Additionally, the Lam Yuen's buildings are comprised of multiple plantation/shack-type structures which do not readily lend themselves to the precise sort of description that residential buildings of a more permanent nature are capable of. Thus, the fact that the CI mistakenly described Pepe's house is unremarkable. Considering that a separate house, adjacent to the Lam Yuen residence, is currently under construction, and that the CI also witnessed Pepe trading marijuana for building supplies, it is understandable that the CI associated the ongoing construction with

---

[8] Defendants themselves point out that "search warrants must be tested in a common sense and realistic, rather than a hypertechnical, manner." *United States v. Turner*, 770 F.2d 1508, 1510 (9th Cir. 1985). Yet, inconsistently, Defendants propose a very *technical* interpretation of the standard.

Pepe's residence. Moreover, having visited the Lam Yuen property multiple times and having seen Pepe and Kolopa sell drugs out of their home, we have no doubt that the CI's description referred to the house actually searched.

■ Second, we find that the officers believed the search warrant accurately described the Lam Yuen's home, and that they in fact intended to search only that structure. There is no dispute that probable cause existed to search the Lam Yuen residence. Further, there is no dispute that the Lt. Leuma and other officers knew that the warrant was for the Lam Yuen residence. Indeed, both Lt. Leuma and Officer Sunia were familiar with Pepe; they had been involved in previous cases against him and were aware of his previous drug and assault convictions. In fact, the affidavit listed two of these convictions. Consequently, we find that Lt. Leuma's belief that the warrant accurately described Pepe's home was objectively reasonable. Based on his testimony, we are satisfied that the warrant described the structure as it was known or should have been known to Lt. Leuma after reasonable inquiry under the circumstances. Likewise, we believe the officers planned to search only Pepe's home and had no intention of searching additional property.

■ Third, we find little risk of officers mistakenly searching other premises. As previously stated, given Lt. Leuma's and Officer Sunia's knowledge of Pepe and his history of illegal activities, we believe they sought only to search his home. Indeed, Lt. Leuma stated that he and his men went directly to the Lam Yuen residence, indicating that the description in the warrant was ample to allow the officers to identify and ascertain Pepe's home. Further reducing the risk of an unauthorized search of another house is the fact that there were no other residents in the area except for Pepe's daughter, White Lam Yuen, whose home is located nearby. White Lam Yuen claims that a second set of officers, not including Lt. Leuma and Officer Sunia, entered into her house looking for Pepe. Lt. Leuma, however, testified that he did not believe that White Lam Yuen's home was searched. Based upon the testimony of these two witnesses, we are not persuaded that officers actually searched her home, or that these officers mistook her home for the Lam Yuen residence.[9]

---

[9] We again point out that without specific addresses, identifying a home in American Samoa, especially one found in village backlands away from main road up in the mountains, is not an exact science. Thus, it is perfectly reasonable for the police to approach the Lam Yuen property from two different entry points.

339

Regardless, this is not a case where police officers conducted a blanket search of a street or neighborhood, searching the homes of various individuals or families in the hope of coming across the correct structure. The officers approached the Lam Yuen property seeking to find and search Pepe's home, a task which they succeeded in doing. The fact that the inaccurate description of Pepe's house created a slight risk of a mistaken search does not operate to invalidate the search.

Lastly, we note that Defendants' reliance on *United States v. Collins*, 830 F.2d 145 (9th Cir. 1987), and *United States v. Ellis*, 971 F.2d 701 (11th Cir. 1992), cases where evidence was suppressed because the warrant did not describe with particularity the place to be searched, is misplaced. First, Defendants contend that these cases impose a *strict* interpretative standard for a warrant's description of the place to be searched, as well as requiring that officers *must* search the place described and not some other place. This is simply wrong. Rather, *Collins* and *Ellis* involved extreme police error in describing the place to be searched, deficiencies that made the potential for a general search significantly greater. Second, Defendants argue that these cases are very similar to the one at hand when in fact they are inapposite. The circumstances in *Collins* and *Ellis* can be distinguished quite easily from those surrounding the search of the Lam Yuen residence.

Regarding the search warrant in *Collins*, the police got the street address wrong twice, got the side of the street wrong once, and they lacked a physical description that would allow them to find the correct house. 830 F.2d at 145-46. The Ninth Circuit, in suppressing the evidence seized from the search, pointed out that the officers were reckless, lacked common prudence, did not carry out their duty to get the right particulars, and in fact misled the judge issuing the warrant. *Id.* at 146.

None of these factors are present here. Lt. Leuma, using the best information available to him at the time, described in the affidavit where he believed Pepe to reside. He in no way misled Judge Ward and in fact, provided a physical description that led to the correct area. Although he erroneously depicted Pepe's home as being under construction— construction that was in fact taking place on a lot adjacent to the Lam Yuen residence—this one error in no way rises to the level of wrongdoing found in *Collins*.

In *Ellis*, the police realized they were searching the wrong mobile home, and after receiving information from its occupant, attempted to search a different mobile home not on the warrant. 971 F.2d at 702-03. Because the warrant neither gave a physical description of the place to be searched nor stated the name of the suspected criminal whose mobile home was to be searched, the court suppressed the evidence obtained in

340

this second search. *Id.* at 703-04. The *Ellis* court noted that because the officers lacked knowledge that could help narrow the search, and because the only information found in the warrant was erroneous, they could not find that the warrant met the requisite standard for particularity. *Id.* at 704.

Here, there was no possibility of a blanket, open-ended search. The property where Pepe's home is located contains only structures belonging to Defendants and their daughter, White. Additionally, Lt. Leuma and Officer Sunia used their personal knowledge of Pepe—and that Pepe was the target of the search—to narrow the search and cure any deficiency in the warrant.

C. Conclusion

As stated above, to comply with the Fourth Amendment's particularity requirement, it is enough that an officer is able to identify and find the location described in the search warrant with a reasonable effort. We find that the warrant sufficiently described Pepe's home so that the executing officers could reasonably ascertain the home to be searched. Accordingly, we deny Defendants' motion to suppress based on a failure to meet the particularity requirement.

Having determined that the warrant described the Lam Yuen residence (Pepe's home) with sufficient particularity, we find it unnecessary to determine whether *Leon's* good faith exception is applicable.

## II. Failure to Adhere to "Knock and Announce" Rule

■ The knock and announcement requirement is an element of the Fourth Amendment reasonableness inquiry involving searches of property. *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995). It requires that law enforcement officers identify themselves and give notice of their authority and the purpose of their search before entering a dwelling. *See id.* at 931-34; 18 U.S.C. § 3109 (2005) (federal knock and announce statute permitting an officer to break into a house only after giving notice of his authority and purpose). This rule is designed to fulfill three purposes: (1) protect the safety of occupants of a dwelling and the police by reducing violence; (2) prevent the destruction of property; and (3) protect the privacy of occupants. *Bonner v. Anderson*, 81 F.3d 472, 475 (4th Cir. 1996).

■ Here, Defendants contend that police officers stormed the Lam Yuen residence without warning or announcement. Yet Defendants provide no evidence or testimony in support of this allegation. Rather, Lt. Leuma testified that upon approaching the Lam Yuen residence and seeing Pepe

and Kolopa outside the house, the officers announced their presence and that they possessed a search warrant. Seeing the officers, Pepe immediately ran into the house and locked himself inside a back room. The police then entered the dwelling through an open front door in pursuit. In view of Lt. Leuma's announcement, Pepe's flight into the house, the readily disposable nature of the contraband named in the warrant, and the fact that the door was wide open, it was more than reasonable for the police to pursue Pepe through the open front door. Clearly, Pepe's and Kolopa's visual awareness of the police officers' presence, in conjunction with Lt. Leuma's announcement, obviated any need to knock. Thus, with respect to the police officers' entry through the open front door, we find the knock and announce rule satisfied, and the purposes behind the requirement fulfilled.

Furthermore, we also find the officers' actions inside the Lam Yuen residence to be reasonable. Upon entering the Lam Yuen residence and finding Pepe locked in a back room, the police repeatedly knocked on the door and announced their purpose. Only after receiving no response did they kick down the door and enter Pepe's bedroom. Additionally, because the police were familiar with Pepe's involvement with marijuana and his prior conviction of assault with a rifle, the officers had every reason to believe that Pepe was attempting to hide or destroy evidence, or preparing himself for armed resistance.

Accordingly, we deny Defendants' motion to suppress based on a failure to knock and announce.

### III. Probable Cause to Search Kolopa's Wallet

A. <u>Staleness of Probable Cause</u>

Probable cause to search cannot be based on stale information that no longer implies that the item sought will be found in the place to be searched. *United States v. Shomo*, 786 F.2d 981, 984 (10th Cir. 1986); *United States v. Haimowitz*, 706 F.2d 1549, 1554-55 (11th Cir. 1983). The information's staleness depends not only upon the number of days between the facts relied upon the issuance of the warrant, but also upon the nature of the criminal activity, the length of the activity, and the nature of the property to be seized. *See American Samoa Gov't. v. Leoso*, 25 A.S.R.2d 103, 105 (Trial Div. 1993) (*citing Shomo*, 786 F.2d at 984).

Kolopa argues that the information provided in the affidavit regarding her alleged criminal activity was "stale" at the time Judge Ward issued the warrant. She contends that because the affidavit is vague as to when Kolopa was seen handling, selling or trading marijuana—sometime

between January 2005 and May 2005—the time lapse between the confidential informant's observations and the issuance of the warrant could be as long as 5 months, making the information stale. As a result, she argues that the search warrant was invalid towards her belongings. In other words, because the search of the woman's wallet—later determined to belong to Kolopa—was beyond the scope of the search warrant, the police lacked probable cause to search it.

We disagree with this conclusion. First, the search warrant was issued for "the house of Pepe Lam Yuen," not the house of Kolopa Lam Yuen, meaning that the warrant was directed solely at Pepe. Second, probable cause for issuing the warrant was based solely on Pepe's handling, selling, and trading of marijuana. The mention of Kolopa selling drugs in the affidavit merely reinforced the notion that illegal drug activity was taking place at Pepe's home. Therefore, because the warrant did not apply to Kolopa, any information regarding her activity cannot be stale. Thus, at least on this basis, probable cause is not lacking to search the woman's wallet.

## B. No Probable Cause Incident to Search of Lam Yuen Residence

■ Searches are limited to areas where the objects of the search are reasonably likely to be found. *See United States v. Ross,* 456 U.S. 798, 824 (1982) (the scope of a search "is defined by the object of the search and the places in which there is probable cause to believe that it may be found."); *see also Garrison,* 480 U.S. at 81. Determining Fourth Amendment reasonableness and probable cause is a factual inquiry, where we look to see whether the officer's response was understandable and reasonable according to the particular situation at hand. *See Wong Sun v. United States,* 371 U.S. 471, 479 (1963) (the quantum of information necessary to constitute probable cause must be measured by the facts and circumstances of the particular case).

In this case, Kolopa argues that there was no probable cause to search the woman's wallet given the scope of the search warrant (i.e., search of Pepe's home). She contends that because of its small size, that it clearly did not belong to Pepe, and that it was not discovered in the bedroom where Pepe was found, the police lacked probable cause to search the wallet.

We disagree. Marijuana, the principal object of the search, can be found in various places. This includes a woman's wallet, where a small bag of marijuana or several "joints" could easily be stored. Accordingly, the police acted reasonably in searching the wallet, as they clearly had grounds for believing that marijuana might be found inside. It is of little consequence that the wallet appeared to belong to a woman, or that it was

discovered outside of the bedroom where the police found Pepe. The search warrant covered the entire Lam Yuen residence, including all items that might contain marijuana, and all areas of the house where marijuana might be stored. Thus, we find that probable cause existed to search the woman's wallet.

## IV. Constitutionality of Kolopa's Arrest

■ Additionally, Kolopa argues that her arrest was constitutionally impermissible, as the police had no way of knowing that the marijuana found in the wallet actually belonged to her. Kolopa asserts that the police had no reason to believe that she was in control of the marijuana or other contraband seized during the search. We disagree with this assertion as well. The police, upon finding various forms of identification belonging to Kolopa in the woman's wallet, had good reason to believe that the marijuana found inside the wallet was her's. Moreover, given that she lived in the same house as Pepe, shared the same bedroom, and had access to the box containing the contraband, the police also had probable cause to arrest her on these grounds.

The possibility that the marijuana or contraband might belong to someone else (i.e., Pepe) does not nullify the officers' probable cause determination. We remind Kolopa that probable cause to arrest is not the equivalent of a conviction. *See Brinegar v. United States*, 338 U.S. 160, 175 (1949) (while "more than bare suspicion" is necessary, there need not be "evidence which would justify condemnation or conviction."); *see also Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Indeed, standards such as "proof beyond a reasonable doubt or by a preponderance of the evidence" have no place in probable cause determinations. *Illinois v. Gates*, 462 U.S. 213, 235 (1983). Consequently, the only issue for the Court to decide is whether or not the officers had *probable cause* to arrest Kolopa, not whether the marijuana and contraband was actually her's. We find that probable cause did exist, and thus the arrest is valid.

## V. Suppression of Defendants' Statements

### A. Statements as Fruits of an Illegal Search Warrant

■ Defendants argue that any statements made contemporaneous with the search are fruits of an illegal search warrant and therefore must be suppressed. Because we find the search warrant valid, we deny Defendants' request to suppress their statements on this ground.

B. Statements Made Absent Miranda Warnings

 Incriminating statements made during a custodial interrogation absent *Miranda* warnings are not admissible. *See American Samoa Gov't. v. Malota*, 5 A.S.R.2d 101 (Trial Div. 1987) (oral confession not admissible when given during custodial interrogation before police administered *Miranda* warnings). Custodial interrogation, however, is a precondition to the *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 478 (1962); *American Samoa Gov't. v. Fealofa`i*, 24 A.S.R.2d. 10 (Trial Div. 1993) (a statement made by a person not in a custodial situation is not subject to · suppression on *Miranda* grounds). Accordingly, this excludes from *Miranda's* scope "general on-the-scene questioning" and "volunteered statements of any kind." *Id.*

 Unfortunately, the task of defining "custody" is a slippery one. Generally speaking, courts look to whether, in light of all the circumstances, a reasonable person in the suspect's position would feel "deprived of his freedom of action in a significant way" while being interrogated. *United States v. Luther*, 521 F.2d 408, 410 (9th Cir. 1975); *see also Stansbury v. California*, 511 U.S. 318, 323 (1994) (reiterating that the test for determining whether a person being questioned by police is in a custodial setting is an objective one). If a person is indeed in custody, even unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must be excluded from evidence under *Miranda*. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985).

 However, an individual questioned in his home is generally deemed not in a custodial setting. *See generally Beckwith v. United States*, 425 U.S. 341 (1976); *see also Gov't. of Virgin Islands v. Berne*, 412 F.2d 1055, 1059-60 (3d Cir. 1969). This limitation is subject to exception where the manner of approach employed by police officers, or the tone of police questioning while at an individual's home, indicates the individual has little or no freedom of action, even in his own home. *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969); *see also Orozco v. Texas*, 394 U.S. 324, 325 (1969). Where pressure is exerted in some way to detain the individual, as when officers surround the individual's home with no intention of letting the individual escape, greet the individual at the door with a drawn gun, place the individual in handcuffs, and/or make physical contact with the individual, a custodial setting *may* be established. *See People v. Hentz*, 394 N.E.2d 586, 589 (Ill. 1979) (custodial setting found where officers had no intention of letting suspect go and at least one of the officers had a gun drawn); *State v. Intogna*, 419 P.2d 59, 65 (Ariz. 1967) (suspect found to be in custody where officer had a gun drawn); *United States v. Averell*, 296 F.Supp. 1004, 1019-20 (E.D.N.Y. 1969) (suspect placed in handcuffs found to be in custody); *State v. Saunders*, 435 P.2d 567-68 (Ariz. 1967) (custodial

setting found where police officer placed hand on defendant's arm and began leading him out of house to police car); *see also American Samoa Gov't. v. Taylor*, 19 A.S.R.2d 105, 106 (Trial Div. 1991) (suspect not in custody where he was not arrested, handcuffed, physically restrained or told directly or indirectly he was not free to go). Here, Defendants argue that they were forcibly detained at some time prior to or during the execution of the search warrant, and thus they were not in custody. They contend that while they were being detained by several police officers, they were asked questions designed to elicit incriminating responses. In response, both Pepe and Kolopa made incriminating statements. They assert that because they were not given *Miranda* warnings prior to the questioning, and because their statements were in response to specific questions, the statements must be suppressed.

■ Regarding Pepe, he moves to suppress two inculpatory statements. The first of the two statements occurred before the search took place, and consisted of a one-sentence response Pepe made when Officer Sunia asked him "Do you have any controlled substances here?" Pepe angrily responded "I got things." This exchange took place while Pepe was physically resisting the police officers' attempt to escort him outside, was belligerent in nature, and was made by Pepe of his own free will. Although no *Miranda* warnings had been given before Officer Sunia asked him "Do you have any controlled substances here?," we still find the statement admissible as evidence. We believe, in light of all the circumstances, that Pepe was not in custody at the time he made this statement. The statement, because it was belligerent in nature and offered in such an excited state, bears more resemblance to a spontaneous statement uttered outside of a custodial setting. Moreover, Officer Sunia posed the question before the search took place and thus before any contraband was found, indicating that it was more of a general on-the-scene question than an actual interrogation. Accordingly, Pepe's pre-search statement should not be suppressed.

Second, upon completion of the search, and in response to Officer Sunia telling Pepe what contraband the officers had found in his home, Pepe remarked "That's my stuff" in Samoan. At the time the statement was made, Pepe was handcuffed and surrounded by police officers. Pepe was clearly in custody, as it is clear that the police had no intention of letting Pepe escape. Thus, Officer Sunia should have given the *Miranda* warnings to Pepe before attempting to elicit an incriminating statement. Because Officer Sunia failed to do so, we must suppress Pepe's post-search statement.

With respect to Kolopa, there is not enough information in the record to address the exclusion of alleged inculpatory statements she may have made. In fact, no evidence at all as to the character or content of such

statements was provided on the record. While they may exist, and while they may have been made absent verbal warning of her *Miranda* rights, we refuse to engage in hypothetical discussions of whether there were statements and whether they should be suppressed.

## Order

We find that the officers' entry into Pepe's home was permissible, Kolopa's arrest was constitutional, and the search of Pepe's house constituted a valid execution of a valid search warrant. Consequently, we deny Defendants' motion to suppress the physical evidence seized from Pepe's home.

Furthermore, we deny Pepe's motion to suppress the pre-search statement, but grant his motion to suppress the post-search statement, as it was made in a custodial setting absent *Miranda* warnings. Regarding any incriminating statements Kolopa may have made, we decline to speculate.

It is so ordered.