The People of the State of Illinois, Plaintiff-Appellant, *v.* Dorothy Reed, Defendant-Appellee.

(No. 71-339;

Second District—December 18, 1972.

SEIDENFELD, J., dissenting.

John B. Roe, State's Attorney, of Oregon, (Alan Cargerman, Assistant State's Attorney, of counsel,) for the People.

Nettles, Mahoney & Mahoney, of Freeport, for appellee.

Mr. JUSTICE ABRAHAMSON delivered the opinion of the court:

This is an interlocutory appeal brought by the State pursuant to Supreme Court Rule 604(a)(1) (Ill. Rev. Stat. 1971, ch. 110A, sec. 604(a)(1)), from an order entered October 20, 1971 by the circuit court of Ogle County suppressing all statements made by the defendant, Dorothy Reed, on February 5, 1971 (the day of her arrest) and all evidence derived therefrom.

On December 23, 1970 the defendant's husband, John Reed, died in a hospital in Madison, Wisconsin. The cause of death was diagnosed as acute arsenic poisoning. On that day, deputy sheriff Melvin Messer of Ogle County visited the Reed home in Polo, Illinois and learned from

Mrs. Reed that her husband had been ill since May, 1970. At that time, Messer took samples of paint and water from the Reed home and a sample of Mrs. Reed's hair.

In early February, 1971, Mrs. Reed agreed to visit the sheriff's office in Oregon to answer some questions about her husband's illness and death. Accordingly, on the morning of February 5, deputy Messer drove her and her married daughter, Linda Poper, from the home in Polo to the office of Sheriff Gerald Brooks. Brooks first read the now well-known *Miranda* warnings to Mrs. Reed from a card he carried. She said she understood her rights and that she wished to talk with them. Brooks then told her that they suspected "foul play" in the death of her husband and asked if she would submit to a lie test. When she agreed, deputy Messer drove her, and her daughter, to the police crime laboratory in Rockford.

At the laboratory, Mrs. Reed was taken to the office of polygraph examiner Nicholas Reiland. Reiland also read the *Miranda* warnings to her and explained a polygraph examination. He emphasized that she did not have to take the test and "could walk out at any time." Mrs. Reed said that she knew her rights and was willing to take the test. When it became apparent to Reiland during the administration of the examination that the defendant was not telling the truth, it was terminated. The two talked further and Mrs. Reed then admitted that she had, on several occasions, put ant poison in her husband's coffee. She repeated the statement to Messer a few moments later when Reiland called him into his office.

Messer then drove the women back to Oregon where he prepared and signed a complaint charging Mrs. Reed with the murder of her husband. After a warrant was obtained and she was formally arrested, Mrs. Reed was asked to repeat her statement before a stenographer and Sheriff Brooks. When she agreed, Messer read the *Miranda* warnings to her for a third time and proceeded only after she indicated that she understood her rights and was willing to waive them. She then repeated her statement which was transcribed by the stenographer while she was taken into court (in an adjoining building) where bond was set and an attorney appointed to represent her. She signed the statement upon her return from court.

On March 4, Mrs. Reed was indicted for murder and on March 11 entered her plea of not guilty. On May 7, the proceedings were suspended, pursuant to motion of the State and over objection, to institute proceedings to determine the competency of the accused to stand trial pursuant to section 104—2 (a) of the Code of Criminal Proceedure. (Ill. Rev. Stat. 1969, ch. 38, sec. 104—2 (a).) On June 1, the court found

her competent to stand trial on the basis of the conclusions of three court-appointed psychiatrists that she both understood the charges against her and was able to assist in her defense.

On June 1, the defendant moved to suppress all confessions, statements, admissions, whether inculpatory or exculpatory, and a hearing on that motion was held on June 23. On September 9, the court entered an order suppressing all statements made by Mrs. Reed on or after February 5 and all other evidence derived from such statements. On October 20, an amended order was entered, pursuant to motion of the State, that expanded the original order to include findings of fact. That order, from which this appeal is taken, concluded as follows:

"The Court further concludes as a matter of law as follows:

(A) That the Defendant, on February 5, 1971, was because of her mental condition as testified to by Dr. Graybill and Mr. Gould, unable to understand or intelligently waive her constitutional rights as enumerated in the Miranda warnings read to her.

(B) That even if she had been able to understand and intelligently waive her constitutional rights, that no conversation with the polygraph operator would be admissible.

(c) That even if she had been mentally able to understand and waive her constitutional rights, that the signed confession would be inadmissible because it was not signed until after an attorney had been appointed for her, and without the presence of that attorney or without his knowledge that the event was taking place.

Therefore, it is Ordered that that part of the Motion to Suppress any and all statements given, or physical evidence obtained, prior to February 5, 1971, be denied, and that portion of the Motion requesting suppression of all statements or physical evidence given or acquired on or after February 5, 1971, as a result of any conversation with the Defendant, be granted."

At the hearing held on June 23, Dr. Graybill, a psychiatrist, testified that he first treated Dorothy Reed in 1962. At that time she complained of insomnia and "head noises". Dr. Graybill saw her on three occasions during that year and prescribed medication. She gave him a history of heavy drinking since she was 15 years old. Psychological tests were administered to her at that time that indicated some organic brain damage. Dr. Graybill diagnosed her condition as a chronic brain syndrome, due to chronic alcoholism, with psychosis.

Dr. Graybill next saw Mrs. Reed in January, 1971 after the death of her husband. Although she had stopped drinking, except for a brief period during 1970, the doctor again diagnosed her condition as a

chronic brain syndrome now joined by a reactive depression secondary to the death of her husband and he prescribed an anti-depressant. On February 6, the defendant was again examined by Graybill, this time at the request of the court. She told him that she had signed a paper the day before and did not "know what it said." She also told him, as she had told Messer and Reiland, that an "evil" Dorothy put the ant poison in her husband's coffee. She appeared confused and still complained of insomnia and "crackling" in her head and Dr. Graybill confirmed his original diagnosis. It was his opinion that the defendant might have some conception of her rights, if they were explained in a simple and uncomplicated way, but that she was "suggestible". He said he had no reason to doubt her statement that she did not understand the paper she had signed the day before.

Mr. William Gould, a clinical psychologist, testified that he administered three tests to Mrs. Reed on March 19, 1971. The first test, a Wexler Adult Intelligence Scale Test, indicated that she had a limited fund of information about the world and was in the lower 23% of the population in general intelligence. The Bender Visual Motor Test demonstrated a difficulty in immediate visual memory and some brain damage. A Rorschach Ink Blot Test showed the defendant to be an anxious, dependent person without much confidence in herself. It was Gould's opinion that Mrs. Reed had an ambulatory type of disorder and could function in benign situations but would break down in stress. It was his further opinion that, because of her dependence, she would place great trust in a police officer or other person in authority and would rely on them to protect her rights. For that reason, Mr. Gould believed the defendant incapable of understandingly waiving her rights or resisting a skillful questioner such as deputy Messer.

■■ The State does not attempt here to argue against the well-established principle that the admissibility of a confession is primarily for the determination of the trial court and will not be disturbed unless against the manifest weight of the evidence. (*People v. Daily*, 41 Ill.2d 116, 242 N.E.2d 170, 172; *People v. Taylor*, 40 Ill.2d 569, 241 N.E.2d 409, 411; *People v. Williams*, 38 Ill.2d 115, 230 N.E.2d 224, 230.) They argue, rather, that the determination of the trial court that the defendant was, "because of her mental condition as testified to by Dr. Graybill and Mr. Gould, unable to understand or intelligently waive her constitutional rights * * *." on February 5 was against the manifest weight of the evidence. We agree.

■■ It was uncontradicted that the defendant was fully advised on three separate occasions on February 5 as to her constitutional rights as enumerated in the case of *Miranda v. Arizona*, 384 U.S. 436. On each

occasion, the defendant stated that she understood her rights and was willing to waive them.

The testimony of Dr. Graybill and Mr. Gould cannot, in view of the other evidence in the record before us, support the conclusion that the defendant was unable to understand or waive her rights. Dr. Graybill testified that she could have some conception of her rights if they were explained to her in a simple and uncomplicated way. He did state that she might be "suggestible" but there is nothing in the record to indicate that her statements were in any way "suggested" or elicited from her by cunning or trickery.

Mr. Gould found the defendant to be, on March 19, anxious and dependent. He also was able to determine, as a result of tests administered by him, that her intelligence was less than average. It was his opinion that she would be incapable of resisting a skillful questioner such as deputy Messer.

■■ The record shows, however, that Mrs. Reed was not questioned skillfully or otherwise, until her constitutional rights were enumerated to her three times in the simple and straightforward language mandated by the United States Supreme Court. It cannot be said that an accused is incapable of understanding or waiving constitutional rights merely because of low intelligence. *People v. Hester*, 39 Ill.2d 489, 237 N.E.2d 466, 474.

In conclusion we repeat that the record does not support the determination of the trial court that the defendant was incapable of waiving her constitutional rights on February 5 because of the mental condition described by Dr. Graybill or the testimony of Mr. Gould. There is absolutely no evidence that the defendant was in any way harassed or that her will was overborne by her interrogators or that her waiver was made other than knowingly and understandingly. The court did find that the defendant was competent to stand trial on the basis of the conclusions of the three court-appointed psychiatrists who said she both understood the charges against her and was able to assist in her defense.

The court ruled that no conversation with the polygraph operator would be admissible. We know of no reason why the conversation or why the confession of the defendant, which was made prior to the appointment of an attorney, would not be admissible.

Accordingly, we hold that the decision of the trial court was against the manifest weight of the evidence and that it must be reversed and the cause remanded for further proceedings.

Reversed and remanded.

GUILD, J., concurs.

Mr. JUSTICE SEIDENFELD dissenting:

The majority correctly states that low intelligence does not *ipso facto* render an accused incapable of understanding or waiving constitutional rights. However, both expert witnesses agreed that defendant's disability went beyond mere low intelligence. Dr. Graybill stated that defendant had a chronic brain syndrome with psychosis, which he described as a state of mind in which an individual departs from reality. He equated the psychosis with the legal term "insanity"; (an insane person cannot know of his constitutional rights, nor intelligently waive them, [*People v. Lambersky* (1951), 410 Ill. 451, 454; *People v. Shroyer* (1929), 336 Ill. 324, 325]) and said that although defendant's psychosis became more florid at times, it was somewhat continuous. Similarly, Mr. Gould stated that defendant had brain damage and suffered from mental illness, which he described as an ambulatory disorder which would be likely to cause her to break down under stress. He further testified as follows:

"Q. Well, with regard to waiving her constitutional rights, would Dorothy Reed, under these circumstances, have the independent will to waive these rights?

MR. ROE: I object to that because there is not a proper foundation; they're not stating the circumstances.

MR. MAHONEY: I have given the circumstances. The circumstances are the ones already given the witness as a prelude on the day in question to Defendants Exhibit #1. I'm referring to the warning given by—right in the first statement—first sentence by Mr. Messer. 'You have the right to remain silent and anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer, and have him present while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish one. Do you understand these rights I have explained to you and having these rights in mind, do you wish to talk to us now and make a statement?' and she says, 'Yes', and I am asking him if she had the will at that time under those circumstances, which I have already related to the witness, giving him that statement, to waive her constitutional rights.

THE COURT: In his opinion?

MR. MAHONEY: In his opinion.

THE COURT: All right, he can answer the question.

A. In my opinion she would not understand the question; she would not understand the concept of constitutional rights; she would not understand the word, 'waive'; she would not know

what it was that she was expected to do, and consequently, the question of will is one that at this point is meaningless. She would not know what it was that was expected of her. She would not know what it was that she was doing in that circumstance.

MR. MAHONEY: Your witness.

MR. ROE: I have no questions."

On the basis of the above testimony, I would conclude that the trial court's finding that defendant's mental condition rendered her unable to understand or intelligently·waive her constitutional rights was not against the manifest weight of the evidence. While I agree that the trial court's finding is to some degree inconsistent with its earlier finding that defendant was competent to stand trial (see *People v. Hart* (1966), 35 Ill.2d 548, 552), I do not think that this requires reversal. A person is competent to stand trial if he can understand the nature and purpose of the proceedings against him, and can assist in his defense. (Ill. Rev. Stat. (1969), ch. 38, sec. 104—1.) This standard is not the same as, and probably less restrictive than, that required in order to make an understanding and intelligent waiver of constitutional rights.

I further disagree with the majority conclusion as to paragraphs (B) and (C) of the trial court's order. The State has neither argued nor briefed the issues raised by these paragraphs, both of which raise difficult questions never specifically decided in Illinois. The State's brief says:

"The 'constitutional fact' which the People attack in this forum was stated in the suppression order as follows:

'(A) That the defendant, on February 5, 1971, was because of her mental condition testified to by Dr. Graybill and Mr. Gould, unable to understand or intelligently waive her constitutional rights as enumerated in the Miranda warnings read to her.'"

Neither paragraph (B) nor (C) would have the effect of suppressing all of defendant's statements, as does paragraph (A). Paragraph (B) suppresses only defendant's conversation with the polygraph operator. Paragraph (C) suppresses only the signed confession of the defendant, due to the fact that it was signed after an attorney was appointed to represent defendant, and without notice being given to this attorney. We should hold that the issues raised by paragraphs (B) and (C) of the suppression order are waived. Ill. Rev. Stat. 1971, ch. 110A, sec. 341 (e) (7).