Peter Alan WERNER, Appellant,

v.

The STATE of Texas, Appellee.

No. 022–85.

Court of Criminal Appeals of Texas, En Banc.

April 9, 1986.

David H. Berg, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and William J. Delmore, III, and Norma Davenport, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

ONION, Presiding Judge.

A jury found appellant guilty of murder and assessed punishment at 10 years' confinement in the Department of Corrections.

The evidence showed that appellant shot and killed Tarbell Griffin Travis, after Travis allegedly damaged an automobile owned by appellant's friend, Kenneth Netterville.

On appeal the appellant raised four grounds of error, the second of which contended the trial court erred in refusing to allow him to introduce certain evidence on the condition of his mind "at the time of the offense" by virtue of the testimony of two police officers and a psychiatrist. The Court of Appeals found the excluded evidence was not relevant to any issue and overruled ground of error number two. Likewise the Court of Appeals rejected the other grounds of error and affirmed the conviction. *Werner v. State*, 680 S.W.2d 858 (Tex.App.—Houston [1st Dist.] 1984). We granted appellant's petition to determine whether the Court of Appeals was correct in overruling the second ground of error relating to the Holocaust syndrome.[1]

The facts form the necessary backdrop for a discussion of appellant's contention. The 21-year-old appellant left work about 10:45 p.m. on April 1, 1982. He bought a six pack of beer and about 11 p.m. went to the Netterville residence on Stillbrooke in

Houston to see Kenneth Netterville. Approximately 45 minutes later while he was on the porch with Kenneth's sister, Carole, appellant saw a car driven by the deceased, Tarbell Travis, speeding onto Stillbrooke from Greenwillow. The car swerved to miss a parked car and collided with Netterville's vehicle on the opposite side of the street. The car backed into Greenwillow and took off at a high rate of speed. Kenneth Netterville came out of the house and gave appellant a pistol stating "Let's go get him" and instructing appellant to go "that way."

Appellant found the vehicle on Spellman Street where the deceased Travis and his passenger, John Christensen, had gotten out to inspect the damage to the vehicle in which they were riding. Appellant parked his car parallel to the other vehicle and got out carrying a flashlight in one hand and the pistol in the other hand. Christensen testified appellant said, "What the hell do you think you're doing? You hit my friend's car. I ought to shoot you." Christensen recalled the deceased responded, "Well, then, why don't you?" At this time appellant shot the deceased in the chest from which wound he expired.

Appellant testified that he pursued the deceased's vehicle "to hold whoever hit my friend's car for the police." After he found the vehicle he stated he "yelled at him to get up against the car," and the deceased replied, "You're just going to have to shoot me, you son of a bitch." Appellant testified the deceased made a "shrugging" motion with his shoulders and took a step towards him. With the flashlight he saw the deceased's face and the deceased "looked crazy." He couldn't see the deceased's hands and didn't know whether the deceased was armed. Appellant stated he was in fear of his life, and to protect himself he shot the deceased in the chest.

Appellant did not know the deceased and apparently had not seen the deceased be-

---

1. In his petition for discretionary review appellant presented four grounds of review, all relating to the second ground of error. He contends the Court of Appeals erred in its analysis of V.T.C.A., Penal Code, § 19.06, as the court misinterpreted the relevancy of the excluded testi-mony, erroneously interpreted V.T.C.A., Penal Code, § 1.07(31), failed to properly apply *McClure v. State*, 575 S.W.2d 564 (Tex.Cr.App. 1979), and erroneously relied upon *Wagner v. State*, 687 S.W.2d 303 (Tex.Cr.App.1985).

fore the occasion in question. At no time during his testimony was he asked or did he state that he was a son or grandson of survivors of the Holocaust, or that stories about the Holocaust had any influence upon his state of mind at the time of the offense.

The excluded testimony was preserved for review by informal bills of exception. It appears from the record that an hour and a half after the officers arrived at the scene of the shooting[2] two officers took the appellant in a patrol car to the police station. It was the conversation in the patrol car that the appellant sought to introduce before the jury.

Officer N.K. McErlane testified he drove the car on the occasion in question and heard a conversation with the appellant about the Holocaust, but that there was no interrogation of appellant. He did not consider it significant, did not include it in any offense report and did not relay the information to anyone connected with the prosecution of the case. McErlane stated the conversation had not been called to his attention until shortly before he testified. He remembered the appellant had stated appellant's father was a survivor of the Holocaust, had been "in some camp ... during the forties" and that the father still had memories of those events which bothered him (the father). McErlane didn't see any relationship between the Holocaust and the shooting. All he could recall of the conversation was that the father was involved in the Holocaust.

Officer Duane Hartman was also in the patrol car when appellant was transported to the police station. He testified that for 10 or 15 minutes appellant voluntarily talked about his family, that his father and grandparents were in the Holocaust, that his father had come from Poland and had been raised in a certain manner, and tried to raise him (appellant) in the same manner. He thought appellant had mentioned appellant's father had been in a Nazi concentration camp and had witnessed people going without argument to the gas chambers, and the father had told appellant

about these things as he grew up. When asked if the appellant had related what his father had told him about the concentration camps, the record reflects:

"A. Basically what he related to me is his sorrow for his father having to see this situation after having seen what he had seen when he was at the Holocaust.

"Q. Basically, he expressed sadness for what his dad had gone through.

"A. Not what his dad had gone through, but what at that time he was putting his father through for the incident, the situation he was in.

"Q. Because of the shooting?

"A. The fact that he was ashamed for putting his father through that again."

Officer Hartman also related appellant stated he knew how Jews felt during the Holocaust as a result of his being handcuffed in the back of the patrol car and being "taken away."

When asked if appellant had said that in growing up he had decided because of his father's experiences to be able to defend himself if he felt threatened. Officer Hartman answered:

"Not exactly like that. We discussed guns and he was very knowledgeable on that. He reflected through *that*, that's how he planned to protect himself. * * * that he would be ready if the time ever arose." (Emphasis added.)

Hartman testified he gave no significance to the statements, did not mention the same in any offense report, and did not relate the information to the prosecutor until that very day of the trial. When asked why, Officer Hartman replied, "As a result of becoming aware that was what he was going to use a defense on the basis of the Holocaust.

Appellant also proffered the testimony of Dr. Rudolph Roden, a board-certified psychiatrist, who received a degree in Russian Literature from Charles University in

2. The record is not clear as to how long after the shooting it was before the officers arrived.

Prague, Czechoslovakia in 1948, a medical degree from Queen's University in Kingston, Ontario in 1955, and a Ph.D. from the University of Montreal in 1965. It was stated Dr. Roden had come to this country three years before from Canada; was board-certified in psychiatry; that Dr. Roden's particular interest was research into the area of survivors and children of survivors of Nazi concentration camps; that the doctor himself was incarcerated in concentration camps from 1940 to 1945. It was also offered that Dr. Roden had lectured and written articles in the field of his specialty. He had conducted seminars in pre-Freudian and Freud, Freud's general psychological theory, male chauvinism, survivor syndrome, and survival.

It was proffered that Dr. Roden would testify that beginning in August, 1982, four months after the alleged offense, he began to see the appellant as a patient, and saw him some 18 or 19 times. Dr. Roden learned that the appellant's paternal grandmother was Jewish, his paternal grandfather was Protestant, and after the grandfather's death in 1941 or 1942 appellant's grandmother and his half-Jewish father and other members of the family were placed in concentration camps, that the father and grandmother survived, the other members of the family did not. Dr. Roden also learned the appellant grew up with stories of concentration camps told to him by his father and grandmother, who related seeing people beaten to death who did not fight back. Dr. Roden determined appellant showed "some" of the characteristics of an individual who has the syndrome associated with children of survivors of Nazi concentration camps.

It was also stated Dr. Roden would testify that the appellant told him of the events that occurred on the night in question. Dr. Roden related that appellant told him the moment he (appellant) pulled the trigger that he wasn't thinking about anything except protecting himself. Dr. Roden would testify, however, "that one does not need to be thinking of an event for another event in one's life to have an effect, a subconscious effect on him;" that the appellant disliked injustice, and one of the greatest injustices was the Holocaust, and that his knowledge thereof shaped his view of self-defense, that the act of the deceased in "running into a car and leaving the scene was an unjust act in the appellant's view, and he sought to right the wrong by detaining the deceased for the police. Dr. Roden would testify that appellant's background caused him to make the decision to protect himself if his life was threatened, and though at the moment the alleged offense occurred he was not thinking of the Holocaust, it "was his state of mind to defend himself because he comes from a family that did not."

The State objected to the proffered testimony of Dr. Roden on the ground of relevancy, that if self-defense is urged the "test to be made by the jury in applying the standard of an ordinary and prudent person in the Defendant's position at the time of the offense."

The appellant disclaimed there was any issue of insanity at the time of the commission of the offense, but urged "the law which requires that the jury be given all the facts and circumstances bearing on the state of mind of the Defendant."

The court overruled the proffer of Dr. Roden's testimony stating:

"THE COURT: In light of the Defendant's testimony, the fact that there is no legal authority at all for such testimony coming before the jury, and because there are no two people alike, everybody is different, everybody comes from a different background, different things happen in the past, because there is no special breed of people that should be treated differently, all must come within the standard of law that we have in the state of Texas, and although the Holocaust is an example of man's inhumane acts towards their fellow man, the Court is going to sustain the objection at this time."

Later the officers' testimony developed earlier in the hearing on the motion in limine was offered by agreement as part of the bill of exception. This, too, was not

permitted to be introduced before the jury on the grounds of relevancy.

There is no claim that the testimony of the appellant in his own behalf was limited or restricted in any way. He simply did not testify that he was suffering from a Holocaust syndrome, or that it had any effect on his actions that night. It was not mentioned at all. What appellant does assert is that it was error to exclude his oral statements to the officers and the opinion testimony of a psychiatrist. An examination of the officers' testimony shows appellant referred to the Holocaust during the conversation in the patrol car, but Officer Hartman described it basically as an expression of sorrow that his father had been through the Holocaust and would now be confronted with appellant's arrest. Appellant made no claim to the officers that he acted in self-defense because of the Holocaust syndrome. Dr. Roden stated appellant told him he was not thinking of the Holocaust at the time of the event in question, that appellant showed "some" of the characteristics of a child of a survivor of the Holocaust, that in his opinion he could have had a subconscious effect on him.

It is well established that evidence must be relevant to a contested fact or issue to be admissible. *Stone v. State,* 574 S.W.2d 85, 89 (Tex.Cr.App.1978); *Aranda v. State,* 640 S.W.2d 766 (Tex.App.—San Antonio 1982). It has been said that in order to determine whether any evidence is admissible, the trial judge should compare its probative value, if any, with the prejudicial and inflammatory aspects of the testimony. *Ruiz v. State,* 579 S.W.2d 206, 209 (Tex.Cr.App.1979); *Albrecht v. State,* 486 S.W.2d 97, 99 (Tex.Cr.App.1972). The determination of this admissibility is within the sound discretion of the trial judge. *Jackson v. State,* 575 S.W.2d 567 (Tex.Cr.App.1979); *Stone v. State,* supra. See also *Fancher v. State,* 659 S.W.2d 836, 840 (Tex.Cr.App. 1983); *Aranda v. State,* 640 S.W.2d 766 (Tex.App.—San Antonio 1982). That determination will not be reversed on appeal unless a "clear abuse" of discretion by the trial judge is shown. *Williams v. State,* 535 S.W.2d 637, 640 (Tex.Cr.App.1976);

*Hernandez v. State,* 484 S.W.2d 754, 755 (Tex.Cr.App.1972); *Ricondo v. State,* 657 S.W.2d 439 (Tex.App.—San Antonio 1983).

It is also settled that evidence of collateral facts which does not in some logical way tend to prove or disprove the matters in issue, is not admissible. And this rule of exclusion is particularly true when the irrelevant evidence tends to create sympathy for the deceased or his family, or to prejudice the defendant before the jury. 4 Branch's Anno.P.C., 2nd Ed., § 2201, pp. 557, 558.

Appellant relies upon V.T.C.A., Penal Code, § 19.06 (Evidence), which provides:

*"In all prosecutions for murder or voluntary manslaughter,* the state or defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense."* (Emphasis added.)

In light of the traditional rules of evidence the Practice commentary to § 19.06 (Searcy and Patterson) felt that need for Article 1257a, V.A.P.C., 1925 (enacted in 1927), the forerunner of § 19.06, was obscure and questioned why it was brought forward in the current Penal Code.

Under former Article 1257a it was held that the general rules of evidence were not changed or extended or limited by the statute. *Wheeler v. State,* 239 S.W.2d 105 (Tex.Cr.App.1951); 4 Branch's Anno.P.C., 2nd Ed., § 2200, p. 557. Further, Article 1257a did not make hearsay testimony admissible or render admissible testimony which otherwise would be objectionable, such as testimony which involved an opinion or conclusion of the witness. *Russell v. State,* 119 Tex.Cr.R. 469, 45 S.W.2d 622 (1931); *Childers v. State,* 150 Tex.Cr.R. 453, 202 S.W.2d 930 (1947); 4 Branch's Anno.P.C., 2nd Ed., § 2200, p. 557.

In *Fazzino v. State,* 531 S.W.2d 818 (Tex. Cr.App.1976), this Court wrote:

"Section 19.06, like its predecessor, Art. 1257a, V.A.P.C., does not extend the rules of evidence to admit hearsay testimony that would be otherwise inadmissible. Jones v. State, supra [515 S.W.2d 126], and authorities there cited." [3]

In *Erwin v. State*, 531 S.W.2d 337 (Tex. Cr.App.1976), it was stated:

"The State's reliance upon this statute [Sec. 19.06] is misplaced, however. It is well established that the statute neither changed, limited, nor extended the general rules of evidence relative to hearsay. *Brooks v. State*, 475 S.W.2d 268 (Tex.Cr. App.1972); *Jones v. State*, 515 S.W.2d 126 (Tex.Cr.App.1974)."

See also *Love v. State*, 581 S.W.2d 679, 681 (Tex.Cr.App.1979); *Calamaco v. State*, 650 S.W.2d 913, 916 (Tex.App.—San Antonio 1983) (no pet.)

Section 19.06 gives the appellant no more special comfort than the general rules of evidence. As the Court of Appeals pointed out in its opinion that the key word in § 19.06 is "relevant," [4] and that it had found no authority that testimony, regardless of relevancy or materiality, is admissible under such statute if it relates to facts and circumstances going to show condition of the mind of the accused at the time of the offense, etc.

Appellant argues the excluded evidence was material to his claim of self-defense, that his use of deadly force arose from a perception, reasonable to him, that he needed to resort to the use of deadly force for self protection, and that a reasonable person, with his background and experience, would not have retreated.

The trial court did not find that the excluded evidence was relevant and therefore admissible, and for there to be reversible error the trial court must have clearly abused its discretion.

The State argues that appellant was not entitled to the defense of self-defense, and certainly not deadly force self-defense, under the facts of the case, despite the "generous trial court" instructing the jury on the issue. Thus the proffered evidence was not material to any contested issue in the case, and was properly excluded; that if self-defense was raised, evidence of the asserted "Holocaust Syndrome" was properly excluded as an impermissible attempt to broaden the right of self-defense beyond that parameters established by V.T.C.A., Penal Code, §§ 9.31, 9.32 and 1.07(31).

Appellant used deadly force in shooting the deceased in the chest with a pistol. Section 9.32 (Deadly Force in Defense of Person) provides the use of deadly force is justified in self-defense only when three conditions are all present: (1) the defendant would have been justified in using force under § 9.31; (2) a reasonable person in the defendant's situation would not have retreated; and (3) the use of deadly force was reasonably believed to be immediately necessary to protect the defendant against another's use or attempted use of unlawful deadly force, or to prevent the imminent commission of specified violent crimes.

■ Appellant testified he did not see any weapon in the possession of the deceased or his companion, Christensen. He did not, and plainly could not have testified that he reasonably believed it necessary to shoot the deceased in order to defend himself against the deceased's use or attempted use of deadly force. In absence of evidence of use or attempted use of deadly force by the deceased, the statutory defense permitted by § 9.32 is not available, and a defendant is not entitled to a jury instruction. See *Ogas v. State*, 655 S.W.2d 322, 324–325 (Tex.App.—Amarillo 1983) (no pet. history); *Jones v. State*, 644 S.W.2d 530, 532 (Tex.App.—Corpus Christi 1982) (no pet. history); *Bray v. State*, 634 S.W.2d

---

**3.** In *Fazzino* it was held § 19.06 did not authorize admission in the murder case of a witness' statement that defendant's wife stated before her death that she was having an affair with another man where the witness had no direct knowledge of the alleged affair.

**4.** In *VanSickle v. State*, 634 S.W.2d 946 (Tex. App.—Ft. Worth 1982, pet. ref'd.), it was pointed out that § 19.06 "by its very terms, limits itself to relevant facts and circumstances."

370, 372–373 (Tex.App.—Dallas 1982) (no pet. history). Further, there is nothing in record to indicate a reasonable person in appellant's circumstance would not have retreated, hence the statutory defense was not raised and need not have been submitted to the jury. *Ogas v. State,* supra; *Bray v. State,* supra. Thus the excluded evidence was not relevant to any real contested issue in the case, and the court in ruling the same inadmissible did not err.

■ Be that as it may, even if the self-defense issue was validly before the jury the proffered testimony was still immaterial. The police officers related appellant spoke of the Holocaust, but his misgivings about the shooting and the effect upon his father were future oriented and did not necessarily explain appellant's state of mind at the time of the offense. Dr. Roden's testimony was that, although appellant continued to disclaim he was not thinking of the Holocaust at the time of the offense, he showed "some" characteristics of the syndrome associated with children of the survivors of the Holocaust, and the same might have had a subconscious effect on him. All that can be inferred from this evidence is that appellant may have been more susceptible to actions in self-defense.

It did not establish that appellant did in fact act under the influence of the Holocaust on the night of the offense. See and cf. *Wagner v. State,* 687 S.W.2d 303, 311 (Tex.Cr.App.1984) (Opinion on Appellant's Motion for Rehearing). The self-defense statutes permit the use of force only when and to the degree a person "reasonably believes" it immediately necessary. As stated in V.T.C.A., Penal Code, § 1.07(31), a "reasonable belief" is one that would be held by an "ordinary and prudent man in the same circumstances as the actor." See *Williams v. State,* 630 S.W.2d 640, 643 (Tex.Cr.App.1982) (Opinion on State's Motion for Rehearing). Although the test assumes that a defendant may act on appearances as viewed from his standpoint, *Killiner v. State,* 516 S.W.2d 671, 674 (Tex.Cr. App.1974), the test also assumes the "ordinary prudent man test of tort law." Practice Commentary to V.T.C.A., Penal Code, § 9.31 (Searcy and Patterson).[5]

The evidence excluded only tended to show that possibly appellant was not an ordinary and prudent man with respect to self-defense. This did not entitle appellant to an enlargement of the statutory defense on account of his psychological peculiarities. A similar point was recently made in

---

5. In *Fielder v. State,* 683 S.W.2d 565, 592 (Tex. App.—Ft. Worth 1985), the Court wrote:

"TEX.PENAL CODE ANN. sec. 9.31(a) (Vernon 1974), this state's self-defense statute, provides that, 'a person is justified in using force against another when and to the degree *he reasonably believes* the force is immediately necessary to protect himself ...". [Emphasis added.] Then, TEX.PENAL CODE ANN. sec. 9.32(3) (Vernon 1974), provides that, '[a] person is justified in using deadly force against another ... when and to the degree *he reasonably believes* the deadly force is immediately necessary ...". [Emphasis added.] Both of these statutory subsections set out a subjective standard of reasonableness. The defendant's state of mind at the time of the incident is therefore, the controlling factor. The question becomes, whether or not the defendant reasonably believed that the use of deadly force was necessary.

"A person's use of deadly force is limited by the application of sec. 9.32(2), which states that '[a] person is justified in using deadly force against another: ... if a *reasonable person in the actor's situation would not have*

*retreated; ...*" (Emphasis added.] This subsection sets out an 'objective' standard and not a subjective standard. The question is not whether the defendant would not have retreated, but whether or not 'a reasonable person' in the same situation would not have retreated. *See Semaire v. State,* 612 S.W.2d 528, 532 (Tex.Crim.App.1981) (Douglas, J., dissenting) (McCormick, J., dissenting); and *Dyson v. State,* 654 S.W.2d 577, 579 (Tex.App.—Fort Worth 1983), *aff'd,* 672 S.W.2d 460 (Tex. Crim.App.1984). The statute requires that the defendant retreat, if he can do so safely, before taking human life. *See* Searcy III and Patterson, *Practice Commentary on Deadly Force in Defense of Person,* 1 TEX.PENAL CODE ANN. 346, 348 (Vernon 1974); and *Valentine v. State,* 587 S.W.2d 399, 402 (Tex. Crim.App.1979). The obligation to retreat arises at the time it becomes necessary for the defendant to use deadly force and requires retreat from the *immediate situation,* if possible. *See Sternlight v. State,* 540 S.W.2d 704, 706 (Tex.Crim.App.1976); and *Young v. State,* 530 S.W.2d 120, 123 (Tex.Crim.App.1975)."

*Gonzales v. State,* 689 S.W.2d 900, 903 (Tex.Cr.App.1985), with regard to V.T.C.A., Penal Code, § 19.04(c) (Voluntary manslaughter), which also utilizes the "reasonable man."

> "Appellant seems to contend that because he is an Hispanic farm worker who was living with a Caucasian woman on a low income he should be granted more latitude in the degree of insult, etc., sufficient to enrage him. Yet appellant fails to recognize that the standard of the reasonable man, the person of ordinary temper, is employed precisely to avoid different applications of the law of manslaughter to defendants of different races, creed, color, sex, or social status."

Appellant relies upon *McClure v. State,* 575 S.W.2d 564 (Tex.Cr.App.1979), a murder prosecution where the issue of voluntary manslaughter was raised by McClure's testimony. There the testimony of a psychiatrist that McClure was suffering from chronic depression and disassociated phenomena prior to shooting his wife was excluded when offered on the issue of voluntary manslaughter and sudden passion. There the Court wrote:

> "The error in excluding the testimony of these three witnesses were (sic) compounded by the refusal to allow Dr. Huddleston to testify before the jury. His testimony certainly was admissible under V.T.C.A., Penal Code, § 19.06, as going to show appellant's state of mind at the time of the offense. Both Huddleston's testimony and that of the three lay witnesses were relevant to appellant's defensive theory that he was guilty only of voluntary manslaughter, and not murder."

First, the reference to § 19.06 in *McClure* as quoted was essentially dictum in light of the court's finding that there was reversible error in the exclusion of testimony of non-expert witnesses. Second, as earlier noted, § 19.06 does not extend the rules of evidence and offer a broader basis for admission of evidence. Third, the instant case and *McClure* are distinguishable on the facts. Lastly, to the

extent *McClure* can be interpreted to authorize testimony such as Dr. Roden's in the instant case it is overruled to the extent of the conflict.

We conclude that the Court of Appeals reached the right result in overruling appellant's ground of error #2. Under the circumstances here presented, the Court of Appeals did not err in its analysis of V.T.C.A., Penal Code, § 19.06, or erroneously interpreted V.T.C.A., Penal Code, § 1.07(31), when taken together with §§ 9.31 and 9.32. Nor did that court properly fail to apply *McClure.* While the Court of Appeals did cite *Wagner v. State,* 687 S.W.2d 303 (Tex.Cr.App.1985), a discussion of that case is not essential to a proper disposition of appellant's contention.

The judgment of the Court of Appeals is affirmed.

CLINTON, J., dissents.

TEAGUE, Judge, dissenting.

Because the majority opinion's interpretation of V.T.C.A., Penal Code, Section 19.06, is clearly and totally erroneous, I dissent. In light of the way the majority opinion interprets Section 19.06, to me at least, it closely resembles something that Piscasso might have painted when he was a very young child.

Section 19.06 is clearly written and provides as follows:

> In all prosecutions for murder or voluntary manslaughter, the state or defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, *together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.* (My emphasis.)

This statute has been a part of our law at least since 1927, and is evidence that the Legislature recognized that the state of mind of the slayer was to be considered by the trier of fact. The Legislature placed no restrictions or limitations on the admis-

sibility of such evidence, save and except that such evidence must go to the condition of the mind of the accused at the time of the offense, and the majority opinion errs in holding that it did otherwise. The fact that this Court might have erroneously interpreted the statute in the past is no justification for this Court to continue to compound the error of interpretation.

In interpreting this statute, and holding that the proffered testimony that Peter Alan Werner, hereinafter referred to as the appellant, wanted admitted into evidence was inadmissible evidence, the majority opinion appears to subscribe to the rule that because we cannot directly see, hear, or feel the state of another person's mind, testimony going to another person's state of mind is based on mere conjecture and therefore has an inadequate data base for its admissibility. Dean Wigmore made short shrift of such foolish thinking when he stated the following: "This argument is finical enough; and it proves too much, for if valid it would forbid the jury to find a verdict upon the supposed state of a person's mind. If they are required and allowed to find such a fact, it is not too much to hear such testimony from a witness who has observed the person exhibiting in his conduct the operations of his mind." 2 J. Wigmore, *Wigmore on Evidence*, Sec. 661 at 773–74 (3rd ed.1940).

Because Section 19.06 is so unmistakenly clearly written, this court has no business trying to rewrite it so that it will read as some members of this Court might desire it to read. It is not the function of this Court to rewrite Section 19.06; it is the function of this Court to interpret the statute as it is written, and, in this instance, because the statute is written in unambiguous language, it is subject to only one interpretation. This Court should give the statute the broad meaning that the Legislature obviously intended it to have when it enacted the statute.

Under Section 19.06, supra, *any* relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense is admissible evidence.

So saith our Legislature. However, by the statute's very terms, before evidence is admissible on the issue of the defendant's state or condition of his mind at the time of the offense, such evidence must be relevant. What this means to me is that any evidence going to the defendant's state of mind at the time the offense was committed is admissible; the statute merely restricts the proof of the state of mind to relevant facts and circumstances going to the state of mind of the defendant at the time the offense is committed. So saith our Legislature.

"Relevancy" is ordinarily defined to be that which conduces to the proof of a pertinent hypothesis—a pertinent hypothesis being one which, if sustained, would logically influence the issue. Hence it is relevant to put in evidence any circumstance which tends to make the proposition at issue either more or less probable. *Waldrop v. State*, 138 Tex.Cr.R. 166, 133 S.W.2d 969 (Tex.Cr.App.1939).

In the dissenting opinion that he filed in this cause, when it was pending in the Houston First Court of Appeals, Justice Levy of that court correctly observed the following: "The very purpose of 19.06's sweeping language was to distinguish the particular 'mind of the accused at the time of the offense' from the mind of the theoretical 'reasonable and prudent man,' and permit the jury, as the trier of fact—not the court—to evaluate the killing in such light." *Werner v. State*, 680 S.W.2d 858, 867 (Tex.App.—Houston [1st] 1984).

My understanding of the appellant's proffer of proof regarding Dr. Roden is that Dr. Roden would not have testified to any ultimate factual issue that had to be resolved by the jury, but, instead, would have merely supplied the jury with background data on the state of mind that the appellant had at the time in question in order to aid the jury in finding what the appellant's state or condition of his mind was at the time of the fatal shooting; thus, he would have explained to them that because the appellant was suffering from the effects of "The Holocaust Syndrome" this

affected his state or condition of his mind at the time of the fatal shooting.

The relevant question, therefore, is whether Dr. Roden's methodology had the required general acceptance—not whether there was, in addition, a general acceptance of the Holocaust syndrome derived from that methodology.

The proffered testimony of Dr. Roden on "The Holocaust Syndrome", and how it affected the condition of the appellant's mind at the time he shot the deceased, should make it obvious to anyone that it comes within the rule that expert opinion testimony on issues to be decided by the jury is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves. "But when the jurors are not competent to infer, without the aid of greater skill than their own, the probable existence of the facts to be ascertained, or the likelihood of their occurring from other facts actually proved, expert opinion evidence is rendered admissible." *Holloway v. State*, 613 S.W.2d 497, 500–01 (Tex.Cr.App.1981). Also see *Hopkins v. State*, 480 S.W.2d 212 (Tex.Cr.App. 1972).

The subject "The Holocaust Syndrome" appears to be a new type of syndrome in psychiatric circles. Excluding a reference to one book entitled *Adolescent Psychiatry: Developmental and Clinical Studies*, at p. 66 (1982), all other references that counsel for the appellant directs us to are articles found in three newspapers. My

independent research has yet to find a single reported court case which has discussed this syndrome.[1]

Although there appears to be a paucity of case law regarding "The Holocaust Syndrome," this in itself should not have been reason for the trial judge to have excluded Dr. Roden's testimony; to the contrary, this is probably the best reason why such testimony should have been admitted in this case. Dr. Roden's testimony was highly relevant on the issue of the condition of the appellant's state of mind at the time he fired the fatal shot, and would have aided the jury, all of whom were probably totally unfamiliar with this type syndrome, in better deciding what the appellant's state or condition of his mind was when he shot the deceased, and how his suffering from "The Holocaust Syndrome" affected the condition of his mind at that time.

Simply because a subject might be shrouded in the mystery of professional skill or knowledge, the light of that knowledge should not be withheld from the jury because of some fine distinction in the ordinary rules of evidence, which the majority opinion opts for. Of course, "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a

---

**1.** My independent research also reveals that the following articles have been written on the subject: Kestenberg, "Psychoanalyses of Children of Survivors From the Nazi Persecution: The Continuing Struggle of Survivor Parents," 5 *Victimology* 368–373 (Spr-Fall 1980); Danieli, "Countertransference in the Treatment and Study of Nazi Holocaust Survivors and Their Children," 5 *Victimology* 355–367 (Spr-Fall 1980); Ammon, "Symposium on the Psychodynamics of the Holocaust—Psychiatric and Psychohistorical Aspects," 17 *Dynamische Psychiatrie* (1984); Nadler, Kav-Venaki, Gleitman, "Transgenerational Effects of the Holocaust: Externalization of Aggression in Second Generation of Holocaust Survivors," 53 *Journal of Consulting & Clinical Psychology* 365–369 (1985); Krell, "Holocaust Survivors and Their Children: Comments on Psychiatric Consequences and

Psychiatric Terminology," 25 *Comprehensive Psychiatry* 521–528 (1984); Virag, "Children of the Holocaust and Their Children's Children: Working Through Current Trauma in the Psychotherapeutic Process," 2 *Dynamic Psychotherapy* 47–60 (Spr-Sum 1984); Schmolling, "Human Reactions to the Nazi Concentration Camps: A Summing Up," 10 *Journal of Human Stress* 108–120 (Fall, 1984); Roden, "Children of Holocaust Survivors," 10 *Adolescent Psychiatry* 66–72 (1982); Steinitz, "Psychological-Social Effects of the Holocaust on Aging Survivors and Their Families," 4 *Journal of Gerontological Social Work* 145–152 (Spr-Sum, 1982); Ornstein, "The Effects of the Holocaust on Life-Cycle Experiences: The Creation and Recreation of Families," 14 *Journal of Geriatric Psychiatry* 135–154 (1981).

well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v. United States*, 293 F. 1013, 1014 (D.C. 1923). However, courts should never be unduly prejudiced against the introduction of expert testimony that is based upon a theory that is in its infancy. Most courts agree that "neither newness nor lack of absolute certainty ... suffices to render it inadmissible in court. Every useful new development must have its first day in court." *United States v. Stifel*, 433 F.2d 431, 438 (6th Cir.1970).

Although I would prefer to have this record more complete on the subject of "The Holocaust Syndrome," nevertheless, I find that all of the requisites for the admissibility of Dr. Roden's testimony have been satisfied. See *Holloway v. State*, supra, which discusses the topic, the requisites for admissibility of an expert witness' testimony. Also see *Hopkins v. State*, supra.

When a relatively large number of persons, having the same symptoms, exhibit a combination or variation of functional psychiatric disorders that leads to purely emotional stress that causes intense mental anguish or emotional trauma, i.e., trauma having no direct physical effect upon the body, psychiatrists put those persons under one or more labels. Today, we have the following labels: "The Battered Wife Syndrome," (see *post*); "The Battered Woman Syndrome;" "The Battered Child Syndrome;" "The Battered Husband Syndrome," (see Steinmetz, "The Battered Husband Syndrome, Victimology," *An International Journal* (1977–1978); Gelles, "The Myth of Battered Husbands—And Other Facts About Sanity Violence," *Ms.* (Oct.,1979); Schultz, "The Wife Assaulter," 6 J. Soc. *Therapy* 103 (1960);" "The Battered Parent Syndrome;" "The Familial Child Sexual Abuse Syndrome," (see *State v. Middleton*, 294 Or. 427, 657 P.2d 1215 (1983); "The Rape Trauma Syndrome," (see "Admissibility, at Criminal Prosecution, of Expert Testimony on Rape Trauma Syndrome," 42 *A.L.R.4th*, commencing at page 879); "The Battle Fatigue Syndrome;" "The Viet Nam Post-Traumatic Stress Syndrome," (see *Miller v. State*, 338 N.W.2d 673, 678 (S.D.1983) (Henderson, J., dissenting opinion); *State v. Felde*, 422 So.2d 370 (La.1982); "The Policeman's Syndrome," see Binder, Psychiatry in the Everyday Practice of Law (2nd ed. 1982);" "The Post-Concussive Syndrome," (Id.); "The Whiplash Syndrome;" "The Low-Back Syndrome;" "The Lover's Syndrome;" "The Love Fear Syndrome," (*People v. Terry*, 2 Cal.3d 362, 85 Cal.Rptr. 409, 466 P.2d 961 (1970); "The Organic Delusional Syndrome;" "The Chronic Brain Syndrome," (*Illinois v. Reed*, 8 Ill.App.3d 977, 290 N.E.2d 612 (1972); and "The Holocaust Syndrome." Tomorrow, there will probably be additions to the list, such as "The Appellate Court Judge Syndrome."

In this instance, there is no challenge by the State to Dr. Roden's qualifications to testify on the subject "The Holocaust Syndrome." From his impressive list of credentials, as well as his study of the subject, Dr. Roden appears to possess special knowledge upon the specific matter about which his expertise was sought.

If scientific, technical, or other specialized knowledge will assist the trier of fact to better understand the evidence or determine a fact in issue, a witness is qualified as an expert by knowledge, skill, experience, training, or education, and he should be able to testify in the form of opinion evidence.

In this instance, I find that the subject "The Holocaust Syndrome" was beyond the ken of the average lay person. The jury was entitled to know that when the appellant fired the fatal shot he believed that because of his past experiences, if his life was ever threatened, he would act to protect himself, and that is why he acted in the manner in which he did, i.e., that his state of mind at the time was affected, not only by that which he visually saw on the night in question, but also because of his belief that it was necessary for him to defend himself because he comes from a

family who did not defend themselves, thus causing them to perish in the Holocaust. Dr. Roden's proffered testimony as to what effect being a descendant of a survivor of "The Holocaust" had upon the appellant, as to his reasonable belief of danger, was not only relevant and material as to his state of mind, but it was also relevant and material on his defense of self-defense, on which the jury was instructed.

It can probably easily be argued that the state of mind or condition of a defendant's mind is not, in the nature of things, susceptible of firsthand knowledge. Hence, testimony directly on the state of mind or condition of a defendant's mind should always be excluded. But for the provisions of Section 19.06, supra, that rule might be appealing. However, when the Legislature of this State enacted Section 19.06, if it had intended to limit the admissibility of testimony going to the defendant's state or condition of his mind at the time the offense was committed it could have easily stated this. However, it chose not to do so and this Court should not graft exceptions, limitations, or place restrictions on the statute that the Legislature did not make or intend to make.

The existence of a state of mind or condition of the mind of another may be proved by circumstances which would produce it. Thus, knowledge may be proved by evidence of what the person was told. A state of mind may also be proved by external manifestations of the person from which the state may be inferred. See *John Hancock Mut. Life Ins. Co. v. Dutton,* 585 F.2d 1289, 1294 (5th Cir.1978) (Daughter permitted to testify as to whether insured believed his wife would shoot him.) Also see *Bohannon v. Pegelow,* 652 F.2d 729, 732 (7th Cir.1981).

Thus, in this instance, the question should be whether the jury could have received any appreciable aid from Dr. Roden's testimony that might have given them guidance in determining what the appellant's state or the condition of his mind was at the time he shot the deceased. *Holloway v. State,* supra, at page 501. Be-

cause I find that Dr. Roden's testimony was both relevant and material on the issue of the appellant's state of mind or condition of his mind when he fired the fatal shot, I must dissent to the majority opinion's contrary holding.

The majority opinion appears to place much stock in the fact that at no time during his testimony was the appellant asked or did he state that he was a son or grandson of survivors of the Holocaust, or that stories about the Holocaust had any influence upon his state of mind at the time of the offense. To me, this reflects or indicates the majority opinion's total lack of understanding of relevancy and materiality. Without the testimony from Dr. Roden, any such testimony from the appellant would have truly been irrelevant and immaterial and the trial judge would have probably committed error by admitting it into evidence. However, had Dr. Roden been permitted to testify, it should be obvious to anyone that we would be reading a record far different from the one that is presently before us—assuming there would have been an appeal.

It is apparent to me that what causes the majority opinion to be so awfully wrong in its interpretation of Section 19.06 lies in the fact that, at least implicitly, it is founded upon the wrong premise in that it construes the proffered testimony to show lack of specific intent. However, as counsel for the appellant has tried to emphasize to this Court, "Appellant never offered the evidence on the issue of specific or 'special' intent. Rather, he offered the evidence under Section 19.06, Tex.Penal Code, to show the condition of his mind at the time of the offense." (P. 8, Appellant's P.D.R.) Thus, operating from this false premise, the majority opinion, just like the opinion of the court of appeals, finds itself strangling because it fails to see the distinction between evidence offered to show a lack of specific intent to kill and evidence offered to show the defendant's state or condition of his mind at the time the offense was committed. Not satisfied with being unable to draw a valid distinction between the

two issues, the majority opinion, like the opinion of the court of appeals, then mixes apples with oranges to get grapefruit juice by trying to tie the provisions of Section 19.06 to the law governing the defense of self-defense.

The majority opinion does not cite us to any authority, nor have I found any, which expressly holds that under Section 19.06, in a prosecution for the offense of murder, testimony that goes to the condition of the mind of the defendant at the time of the commission of the offense, before it is admissible, must be relevant on the issue of the defense of self-defense. Section 19.06 is clearly worded, and permits the defendant to present any "relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." Under Section 19.06, supra, the admissibility of evidence is not limited by the law of self-defense.

Today, the majority opinion rules out evidence concerning "The Holocaust Syndrome." In light of this opinion, what will tomorrow bring?

Although there are obvious differences between the syndrome now known as "The Battered Wife Syndrome" and the syndrome now known as "The Holocaust Syndrome," in principle they have much in common. Today, it is not unusual for our more enlightened trial courts to admit testimony of expert witnesses on "The Battered Wife Syndrome," as relevant to explain the legitimacy of a wife's reactions to threats of danger from her spouse, and to counteract prosecutorial claims that the wife's continued presence in the home means that the homicide was not necessary. It should be obvious to almost anyone that without such testimony it would be difficult, if not impossible, for persons unfamiliar with how "The Battered Wife Syndrome" manifests itself to understand what effect the actions of the former spouse had on the state or condition of the wife's mind when she shot and killed her former spouse. In any event, it simply cannot be logically argued that such testimony would not be of assistance to the trier of fact in determining

what the condition of the defendant's mind might have been when the offense was committed. See Robinson, 2 *Criminal Law Defenses*, Section 131(a), footnote 4.

All courts are not in agreement that expert testimony in "The Battered Woman Syndrome" type case is always admissible. Some courts have held that such testimony is relevant to the issue of self-defense and therefore admissible, see *State v. Allery*, 101 Wash.2d 591, 682 P.2d 312 (1984); *State v. Kelly*, 97 N.J. 178, 478 A.2d 364 (1984); *State v. Leidholm*, 334 N.W.2d 811 (N.D.1983); *State v. Anaya*, 438 A.2d 892 (Me.1981); *Smith v. State*, 247 Ga. 580, 277 S.E.2d 687 (1981), on remand, 159 Ga.App. 183, 283 S.E.2d 98 (1982); *Hawthorne v. State*, 408 So.2d 801 (Fla.Dis.Ct.App.1982); *State v. Middleton*, 294 Or. 427, 657 P.2d 1215 (1983); *Ibn-Tamas v. United States*, 407 A.2d 626 (D.C.1979), appeal after remand, 455 A.2d 893 (D.C.1983), other courts have held that such testimony is admissible for reasons other than self-defense, see *People v. Minnis*, 118 Ill.App.3d 345, 74 Ill.Dec. 179, 455 N.E.2d 209 (1983); *State v. Baker*, 120 N.H. 773, 424 A.2d 171 (1980); *State v. Kelly*, 102 Wash.2d 188, 685 P.2d 564 (1984); *Buhrle v. State*, 627 P.2d 1374 (Wyo.1981); *Fultz v. State*, 439 N.E.2d 659 (Ind.App.1982); *Commonwealth v. Mc Cusker*, 448 Pa. 382, 292 A.2d 286 (1972), while other courts hold that such testimony is absolutely inadmissible, see *State v. Thomas*, 66 Ohio St.2d 518, 423 N.E.2d 137 (1981); *People v. White*, 90 Ill.App.3d 1067, 46 Ill.Dec. 474, 414 N.E.2d 196 (1980). Also see the annotation entitled "Admissibility of Expert or Opinion Testimony on Battered Wife or Battered Woman Syndrome," 18 *A.L.R.4th*, commencing at page 1153; *Criminal Law Defenses*, supra; Thar, "The Admissibility of Expert Testimony on Battered Wife Syndrome ... An Evidentiary Analysis," 77 *Northwestern Law Review* 348 (1982); Jones, "When Battered Women Fight Back," 9 *Barrister* 12 (Fall, 1982); "The Battered Wife's Dilemma: To Kill or to be Killed," 32 *Hastings Law Journal* 895 (1981); Cross, "The Expert as Educator: A Proposed Approach to the Use of Battered

Woman Syndrome Expert Testimony," 35 *Vanderbilt Law Review* 741 (1982); Giannelli, "The Admissibility of Novel Scientific Evidence: Frye v. United States, A Half-Century Later," 80 *Colum. Law Review* 1197 (1980); Comment, "Expert Testimony Based Upon Novel Scientific Technique: Admissibility Under Federal Rules of Evidence," 48 *George Washington Law Review* 774 (1980); Graham, "Lay Witness Opinion Testimony; Opinion on Ultimate Issue By Lay or Expert Witness," *Criminal Law Bulletin*, March-April 1986), commencing at page 144.

The problem with using the above authorities lies in the fact that the provisions of Section 19.06 are not implicated in any of the cases cited, or any of the articles mentioned.

However, the lack of uniformity is not surprising; attempts to expand testimony into new fields have often resulted in judicial confusion and inconsistency. In sum, "There has never been a precise formulation of how courts should decide whether certain evidence is a proper subject for 'expert testimony'." *Northwestern Law Review*, supra.

I agree that if one restricts Section 19.06 to the law of self-defense, i.e., that before a defendant can introduce expert testimony going to his state of mind at the time he committed the offense, he must tie this testimony to the defense of self-defense, such expert testimony would probably not be admissible. But, that is the point. In enacting Section 19.06, the Legislature did not restrict or intend to restrict testimony going to a defendant's condition of his mind at the time the offense was committed to the defense of self-defense; it just made such testimony admissible in order that the trier of fact could place whatever weight that it desired to place on such testimony in deciding what the condition of the defendant's state of mind might have been when the offense was committed.

How testimony going to the defendant's state of mind can ever be inadmissible under Section 19.06, in making the determination of what the state or condition of his mind might have been at the time in question, clearly escapes me, and the majority opinion does not truly explain how, under the express provisions of Section 19.06, the testimony of Dr. Roden was inadmissible to show the appellant's state or condition of his mind at the time he fired the fatal shot. For this reason, if no other, the majority opinion is simply dead wrong in holding that the trial court did not err in excluding the proffered testimony of Dr. Roden.

For the above and foregoing reasons, I respectfully dissent.