

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-07-00139-CR

_____

BOBBY C. BEARD, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 76th Judicial District Court
Morris County, Texas
Trial Court No. 9560

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Though there is contrary testimony, Bobby C. Beard says he had been shot at earlier on October 25, 2006, by Renaldo Frazier as Beard drove by the Daingerfield mobile-home residence of Lola May Hendrix, Renaldo's mother. In the immediate aftermath of that event, Beard drove to his nearby residence, retrieved a handgun, and drove by the Hendrix residence again. According to Beard's testimony, Renaldo, standing between two cars parked just in front of the Hendrix residence, again shot at Beard's car. The result was Beard's firing at least four,[1] maybe as many as seven, shots toward Renaldo. Inside the residence at the time were Hendrix and her three-year-old grandson. At least three of Beard's shots hit the residence, shattering windows in the bedroom and kitchen.

A Morris County jury found Beard guilty of deadly conduct and assessed punishment at ten years' confinement and a $ 5,000.00 fine. *See* TEX. PENAL CODE ANN. § 22.05 (Vernon 2003). Beard's appeal urges one point of error: that the trial court erred by refusing to instruct the jury on self-defense. Because we conclude (1) the evidence did not raise the issue of self-defense,[2] and (2) no harm resulted from any error, we affirm the trial court's judgment.

---

[1]Beard testified that he shot "about four times," which was all the bullets he had in his gun.

[2]The State argues that a self-defense instruction is either precluded or limited on these facts because Beard was convicted of deadly conduct by firing at a habitation. We do not reach the issues relating to the interaction between the elements of Section 22.05(b)(2) and self-defense as it relates to another person. Here, we conclude the evidence does not raise self-defense. Any discussion regarding the application of law of self-defense to this situation in which the target is a human and the charged conduct deals with discharging a firearm in the direction of a habitation is beyond the scope of this appeal.

2

Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, we must determine whether error occurred. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id.* at 731–32.

*(1)      The Evidence Did Not Raise the Issue of Self-Defense*

A person commits a felony offense if he or she knowingly discharges a firearm at or in the direction of a habitation, building, or vehicle and is reckless as to whether the habitation, building, or vehicle is occupied. TEX. PENAL CODE ANN. § 22.05(b)(2), (e). Under subparagraph (b)(2), two culpable mental states must be shown: the actor must knowingly discharge a firearm at or in the direction of a building and be reckless as to whether the building is occupied. *See Yandell v. State*, 46 S.W.3d 357, 361 (Tex. App.—Austin 2001, pet. ref'd). It is undisputed that Beard's shooting the gun was deadly force.

Special rules govern the use of deadly force in self-defense. "Deadly force" is force that is intended or known by the actor to cause death or serious bodily injury, or force that is capable of causing death or serious bodily injury in the manner of its use or intended use. TEX. PENAL CODE ANN. § 9.01(3) (Vernon Supp. 2008). "Serious bodily injury" is bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. TEX. PENAL CODE ANN. § 1.07(a)(46) (Vernon Supp. 2008).

3

Beard would have been justified in using deadly force in self-defense if: (1) under Section 9.31, self-defense is justified,[3] (2) a reasonable person in Beard's situation would not have retreated,[4] and (3) Beard reasonably believed the use of deadly force was immediately necessary to protect him against Renaldo's use or attempted use of unlawful deadly force. *See* TEX. PENAL CODE ANN. § 9.32(a).

Beard bears the burden of producing some evidence that would support the defense. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991); *Tidmore v. State*, 976 S.W.2d 724, 729 (Tex. App.—Tyler 1998, pet. ref'd). In order to be entitled to an instruction on the use of deadly force in self-defense, then, Beard was required to produce some evidence on each of the above three elements of Section 9.32 of the Texas Penal Code. *See Werner v. State*, 711 S.W.2d 639, 644 (Tex. Crim. App. 1986);

---

[3]A person is justified, under Section 9.31, in using force against another when and to the degree he or she reasonably believes the force is immediately necessary to protect himself or herself against the other's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31(a) (Vernon Supp. 2008).

[4]At the time Beard committed this offense—in October 2006—a defendant who used deadly force was required to establish that "a reasonable person in the actor's situation would not have retreated." Act of May 16, 1995, 74th Leg., R.S., ch. 235, § 1, 1995 Tex. Gen. Laws 2141, 2141–42 (amended 2007) (current version at TEX. PENAL CODE ANN. § 9.32 (Vernon Supp. 2008)). In 2007, the Texas Legislature amended Section 9.32 to remove the requirement that "a reasonable person in the actor's situation would not have retreated." *See* Act of May 16, 1995, 74th Leg., R.S., ch. 235, § 1, 1995 Tex. Gen. Laws 2141, 2141–42, *amended by* Act of March 20, 2007, 80th Leg., R.S., ch. 1, § 3, 2007 Tex. Gen. Laws 1, 1–2. Since this offense was committed in 2006, we will analyze Beard's contention under the prior version of Section 9.32. *See* Act of March 20, 2007, 80th Leg., R.S., ch. 1, § 3, 2007 Tex. Gen. Laws 1, 1–2 (offense committed before Act's effective date governed by sections in effect when offense committed).

*Holmes v. State*, 830 S.W.2d 263, 265 (Tex. App.—Texarkana 1992, no pet.). That said, we turn our attention to Section 9.32's element of retreat, noting that Beard had to produce some evidence to show that a reasonable person in his position would not have retreated. *See Halbert v. State*, 881 S.W.2d 121, 125 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

An accused is entitled to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the evidence. *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999). An instruction on self-defense is not required, however, if the evidence, viewed in a light favorable to the defendant, does not raise the issue of self-defense. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993). In the context of self-defense by deadly force, some evidence of the inability to retreat is all that is necessary. *Guilbeau v. State*, 193 S.W.3d 156, 161 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *Halbert*, 881 S.W.2d at 125. The evidence does not raise self-defense when it depicts circumstances in which a reasonable person would have retreated and establishes that the defendant did not attempt to retreat. *See Riddle v. State*, 888 S.W.2d 1, 7 (Tex. Crim. App. 1994); *Coble v. State*, 871 S.W.2d 192, 202 (Tex. Crim. App. 1993); *Martinez v. State*, 775 S.W.2d 645, 647 (Tex. Crim. App. 1989); *Ceasar v. State*, 939 S.W.2d 778, 781 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd).

With those guideposts in mind, we examine the evidence.

Hendrix testified that she was inside her house with her grandson October 25, 2006. From her kitchen window, she saw Beard drive fast down County Road 3104. Approximately three minutes later, Hendrix was looking out the front door of her house when Beard came back up the road, still driving fast. Beard then hit his brakes, rolled down his window, and began shooting in the direction of her house. She recalled him shooting five or six shots. Her grandson was about an arm's length behind her at the time playing video games. One bullet came through the kitchen window at which Hendrix had been standing minutes earlier. Another bullet broke through her bedroom window and hit the headboard of her bed. She knew Beard and recognized him as the driver of the car and the shooter.

At the time of the shooting, Renaldo and Hendrix's daughter, Shanaldo Frazier, had just arrived at the house and were visiting in the front yard. Describing the shooting, Hendrix testified that Beard came to a complete stop before firing the gun, drove away slowly, and then turned right onto another street. She also testified that Renaldo was not armed and had not fired at Beard either time Beard had driven by the house.

Shanaldo testified similarly that she and her brother had just arrived at their mother's house and were talking by two vehicles parked just in front of the residence. Shanaldo also knew and clearly recognized Beard as the shooter. According to Shanaldo, Beard lowered his window as he slowed to a slow roll and started firing.

6

Kayneisha King, Beard's girlfriend and mother of two of his children, testified at trial. King was driving around with Beard October 25, 2006, when she and Beard first went by the Hendrix house on the way to her mother's house where she and Beard also lived. King testified that, when she and Beard first drove by the Hendrix house, Renaldo and Shanaldo were in front of the house and Renaldo began running toward their car and fired two or three shots at them. Importantly, King never saw Renaldo shooting during the first trip past the Hendrix house; she only heard the second and third shots. Although the State questioned King about how she would otherwise know about a first shot if she did not hear or see it, she never clarified how she knew of the first shot.

When asked why she or Beard did not report the incident, King insists that she went to the sheriff's office but that no one at the office took a report because she got sick, being pregnant and upset by the incident. Although she conceded that there was a telephone at her mother's residence and although she may have had a cell phone, no one attempted to phone in a report that Renaldo had shot at them during their first trip by the Hendrix house. Later in her testimony, King does claim that she called about Renaldo shooting at them and that police failed to show up. The State pointed out to her that the call logs from the Morris County dispatch do not show such a call from King or Beard, but did show a call from the Hendrix house presumably reporting that Beard shot at the Hendrix house. King also admitted that she and Beard had been looking for Renaldo that day.

According to King, she and Beard arrived at the King residence after having first driven by the Hendrix house. While at the King residence, Beard retrieved a gun from somewhere in or near

the King residence. King did not know where the gun came from. Beard left the house by himself to drive back by the Hendrix home. Although she was standing outside after being dropped off at her mother's residence, which is approximately 200 yards away from the Hendrix house, she testified that she did not hear any of the shots fired after Beard left to go back by the Hendrix house.

Beard testified that King was driving when Renaldo began firing at them when they first drove by the Hendrix house. The two had seen both Renaldo and Shanaldo earlier that day. He explained that he retrieved his gun from the woods behind King's mother's house and decided to leave and go "chill" with his family, suggesting that he wanted to leave the area without further incident. Beard also testified that, after he had retrieved his gun, various people at the King residence tried to calm him down and urged him not to do "nothing stupid." Saying that he was fearful of staying at the King residence at that time, he resolved to drive to the other location and be with some relatives. To get to his family's house, though, he had to go back by the Hendrix house where Renaldo was. Beard testified that, as he drove by slowly, he was "minding [his] own business" and "driving slow 'cause [he] ain't paying no attention." He was playing loud music on his sound system and had all his car windows rolled down. He noted several times that he had his gun in the passenger seat but only "for [his] safety." As he drove back by the Hendrix house, Beard explained, Renaldo again fired a gun in his direction, prompting Beard to stop his car and shoot back, as he explains, "for [his] safety." When asked why he denied having fired any shots when

interviewed by police, he explained that he wanted to see the evidence against him, that he was still mad, and that the officers were not listening to his side of the story.

In the instant case, we note that, although Beard claims Renaldo shot at him only minutes earlier, Beard retrieved his own gun and, by his own account, slowly drove back by the Hendrix house playing loud music with all of his car windows down. He explained that Renaldo again shot at him. The evidence indicates that Renaldo stood near the front of the house, which sat as much as eighty-two yards[5] from the road, demonstrating that Beard could have attempted "retreat"—simply driven away—rather than stopping and shooting. Indeed, a reasonable person not spoiling for a fight would have used his or her superior mobility to drive away from danger, in the second instance in which Beard claims Renaldo shot at him. The evidence establishes, though, that Beard instead brought his car to "a complete stop," as Beard testified, and then shot several rounds in the direction of the Hendrix house in the second instance. Indeed, Beard had driven away in the first instance, when he had no gun.

So, assuming, *arguendo*, that Renaldo had shot at Beard when he drove by, a reasonable person in Beard's situation would have retreated rather than coming to a complete stop and firing a gun four to seven times.[6] The record here contains no evidence suggesting that a reasonable person

---

[5]Other evidence suggested the distance from road to residence was thirty to forty yards, but that evidence was portrayed as an estimate, while the distance of eighty-two yards had been paced off by an officer.

[6]Even if a shot or two could be seen as a reasonable defensive measure as Beard was driving off, that is, retreating, spraying the residence with four to seven shots could not be seen as such,

in Beard's position would not have retreated. No evidence, for example, suggests that Beard was in any way trapped into a confrontation or that, rather than retreating, he was essentially forced to shoot four or more shots to protect himself. That said, the evidence fails to raise the issue of self-defense by deadly force.

*(2) No Harm Resulted from any Error*

Even if the evidence had been sufficient to raise the issue of self-defense using deadly force, and the trial court, thus, erred in not instructing the jury on self-defense, we conclude that any such error would have been harmless.

Where a trial court's charge to the jury contains error, we should analyze the error for harm under the standard of Article 36.19 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 36.19 (Vernon 2006). We are not to reverse a conviction or sentence on the basis of jury charge error "unless the error appearing from the record was calculated to injure the rights of the defendant, or unless it appears that the defendant has not had a fair and impartial trial." *Id.* This language created two separate harm-analysis standards: the first to be used when a timely objection is made to the charge; the second to be used when no such objection appears in the record. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). The first standard dictates that reversal should occur if the defendant made a timely objection and if there is some harm

---

especially considering the relative mobility of Beard and Renaldo and the distance between them.

10

to the defendant from the error.  *Id*.  Properly preserved jury-charge error requires reversal unless it is harmless.

Here, Beard timely sought a self-defense instruction; thus, if failure to give the self-defense instruction was error, the error would have been reversible if Beard could show any degree of harm from not receiving the instruction.  We assess the degree of harm "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole."  *Id*.; *see Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).  Beard has the burden to persuade us that he suffered some actual harm as a consequence of a charge error; otherwise we would affirm.  *See Abdnor*, 871 S.W.2d at 732.  "[T]he presence of any harm, regardless of degree, which results from preserved charging error, is sufficient to require a reversal of the conviction.  Cases involving preserved charging error will be affirmed only if no harm has occurred."  *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986) (no harm where no definition of reasonable belief); *see also Cathey v. State*, 992 S.W.2d 460, 466 (Tex. Crim. App. 1999) (failure to instruct jury on accomplice-witness rule harmless error where sufficient evidence to convict defendant as principle).

On the other hand, the appellant must demonstrate actual, as opposed to possible, harm.  *Medina v. State*, 7 S.W.3d 633 (Tex. Crim. App. 1999).  Significant evidence militating against a defense-requested instruction or finding can render an error harmless.  *Id*. at 642–43.

11

We find significant evidence here militating against a self-defense instruction. Beard was in a motor vehicle which was moving under power on a public street. Just minutes before, he had been driving down the same road and was shot at. Immediately after that, he drove away only to retrieve his gun, put it on the seat beside him, and return to the scene of the initial shooting. As might be expected, Renaldo, on foot, heard and saw Beard's vehicle once again driving by and fired at him from his position in the yard, some eighty-two yards away from Beard's vehicle. None would conclude that Beard was in any way surprised to be shot at this time or that he was not ready and able to speed his car away to avoid trouble should he have wanted to do so rather than take the opportunity to shoot multiple shots in the direction of Renaldo and the residence. No reasonable jury would have found that Beard acted in self-defense. Even if there were error in failing to submit the issue of self-defense, there was no harm.

We overrule Beard's sole point of error and affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     February 19, 2008
Date Decided:      September 5, 2008

Do Not Publish